**JUDGE CARTER**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

     - v. -          :

MICHAEL COHEN,          :

     Defendant.          :

               :

- - - - - - - - - - - - - - - - - - x

**INFORMATION**

18 Cr.

**18 CRIM 850**

The Special Counsel charges:

## Background

### The Defendant

1.    From in or around 2007 through in or around January 2017, MICHAEL COHEN, the defendant, was an attorney and employee of a Manhattan-based real estate company (the "Company").   COHEN held the title of "Executive Vice President" and "Special Counsel" to the owner of the Company ("Individual 1").

### False Statements to the U.S. Congress

2.    On or about January 13, 2017, the U.S. Senate Select Committee on Intelligence ("SSCI") announced that it would conduct an investigation into Russian election interference and possible links between Russia and individuals associated with political campaigns.    On or about January 25, 2017, the House of Representatives Permanent Select Committee on Intelligence ("HPSCI") announced that it also was conducting an investigation



into Russian election interference and possible links between Russia and individuals associated with political campaigns.

3.    On or about August 28, 2017, COHEN caused a two-page letter to be sent on his behalf to SSCI and HPSCI.  The letter addressed his efforts at the Company to pursue a branded property in Moscow, Russia (the "Moscow Project").  COHEN stated the purpose of the letter was "to provide the Committee with additional information regarding the proposal," referring to the Moscow Project.

4.    In the letter to SSCI and HPSCI, COHEN knowingly and deliberately made the following false representations:

> a. **The Moscow Project ended in January 2016 and was not discussed extensively with others in the Company.** "The proposal was under consideration at the [Company] from September 2015 until the end of January 2016. By the end of January 2016, I determined that the proposal was not feasible for a variety of business reasons and should not be pursued further.  Based on my business determinations, the [Company] abandoned the [Moscow Project] proposal. . . .  To the best of my knowledge, [Individual 1] was never in contact with anyone about this proposal other than me on three occasions. . . .  I did not ask or brief [Individual

2

1], or any of his family, before I made the decision to terminate further work on the proposal."

b. **COHEN never agreed to travel to Russia in connection with the Moscow Project and "never considered" asking Individual 1 to travel for the project.** "I primarily communicated with the Moscow-based development company . . . through a U.S. citizen third-party intermediary, [Individual 2]. . . . [Individual 2] constantly asked me to travel to Moscow as part of his efforts to push forward the discussion of the proposal. I ultimately determined that the proposal was not feasible and never agreed to make a trip to Russia. . . . Despite overtures by [Individual 2], I never considered asking [Individual 1] to travel to Russia in connection with this proposal."

c. **COHEN did not recall any Russian government response or contact about the Moscow Project.** "In mid-January 2016, [Individual 2] suggested that I send an email to [Russian Official 1], the Press Secretary for the President of Russia, since the proposal would require approvals within the Russian government that had not been issued. Those permissions were never provided. I decided to abandon the proposal less than two weeks

3

later for business reasons and do not recall any response to my email, nor any other contacts by me with [Russian Official 1] or other Russian government officials about the proposal."

5. On or about September 19, 2017, COHEN was scheduled to appear before SSCI accompanied by counsel. In prepared remarks released to the public, COHEN stated, "I assume we will discuss the rejected proposal to build a [Company-branded] property in Moscow that was terminated in January of 2016; which occurred before the Iowa caucus and months before the very first primary. This was solely a real estate deal and nothing more. I was doing my job. I would ask that the two-page statement about the Moscow proposal that I sent to the Committee in August be incorporated into and attached to this transcript."

6. On or about October 25, 2017, COHEN gave testimony to SSCI, which included testimony about the Moscow Project consistent with his prepared remarks and his two-page statement.

7. In truth and in fact, and as COHEN well knew, COHEN's representations about the Moscow Project he made to SSCI and HPSCI were false and misleading. COHEN made the false statements to (1) minimize links between the Moscow Project and Individual 1 and (2) give the false impression that the Moscow Project ended before "the Iowa caucus and . . . the very first primary," in hopes of

4

limiting the ongoing Russia investigations.   COHEN attempted to conceal or minimize through his false statements the following facts:

        a. **The Moscow Project was discussed multiple times within the Company and did not end in January 2016.**   Instead, as late as approximately June 2016, COHEN and Individual 2 discussed efforts to obtain Russian governmental approval for the Moscow Project.   COHEN discussed the status and progress of the Moscow Project with Individual 1 on more than the three occasions COHEN claimed to the Committee, and he briefed family members of Individual 1 within the Company about the project.

        b. **COHEN agreed to travel to Russia in connection with the Moscow Project and took steps in contemplation of Individual 1's possible travel to Russia.**   COHEN and Individual 2 discussed on multiple occasions traveling to Russia to pursue the Moscow Project.

            i.   COHEN asked Individual 1 about the possibility of Individual 1 traveling to Russia in connection with the Moscow Project, and asked a senior campaign official about potential business travel to Russia.

5

ii.  On or about May 4, 2016, Individual 2 wrote to COHEN, "I had a chat with Moscow. ASSUMING the trip does happen the question is before or after the convention . . . Obviously the pre-meeting trip (you only) can happen anytime you want but the 2 big guys where [sic] the question. I said I would confirm and revert." COHEN responded, "My trip before Cleveland. [Individual 1] once he becomes the nominee after the convention."

iii. On or about May 5, 2016, Individual 2 followed up with COHEN and wrote, "[Russian Official 1] would like to invite you as his guest to the St. Petersburg Forum which is Russia's Davos it's June 16-19. He wants to meet there with you and possibly introduce you to either [the President of Russia] or [the Prime Minister of Russia], as they are not sure if 1 or both will be there. . . . He said anything you want to discuss including dates and subjects are on the table to discuss."

iv.   On or about May 6, 2016, Individual 2 asked COHEN to confirm those dates would work for him to travel. COHEN wrote back, "Works for me."

v.   From on or about June 9 to June 14, 2016, Individual 2 sent numerous messages to COHEN about the travel, including forms for COHEN to complete. However, on or about June 14, 2016, COHEN met Individual 2 in the lobby of the Company's headquarters to inform Individual 2 he would not be traveling at that time.

c. **COHEN did recall that in or around January 2016, COHEN received a response from the office of Russian Official 1, the Press Secretary for the President of Russia, and spoke to a member of that office about the Moscow Project.**

i.   On or about January 14, 2016, COHEN emailed Russian Official 1's office asking for assistance in connection with the Moscow Project. On or about January 16, 2016, COHEN emailed Russian Official 1's office again, said he was trying to reach another high-level Russian official, and asked for someone who spoke English to contact him.

7

ii.   On or about January 20, 2016, COHEN received an email from the personal assistant to Russian Official 1 ("Assistant 1"), stating that she had been trying to reach COHEN and requesting that he call her using a Moscow-based phone number she provided.

iii.   Shortly after receiving the email, COHEN called Assistant 1 and spoke to her for approximately 20 minutes. On that call, COHEN described his position at the Company and outlined the proposed Moscow Project, including the Russian development company with which the Company had partnered.   COHEN requested assistance in moving the project forward, both in securing land to build the proposed tower and financing the construction.   Assistant 1 asked detailed questions and took notes, stating that she would follow up with others in Russia.

iv.   The day after COHEN's call with Assistant 1, Individual 2 contacted him, asking for a call. Individual 2 wrote to COHEN, "It's about [the President of Russia] they called today."

8

## COUNT 1
### (False Statements)

8.    Paragraphs 1 through 7 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

9.    On or about August 28, 2017, the defendant MICHAEL COHEN, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, to wit, COHEN caused to be submitted a written statement to SSCI containing material false statements about the Moscow Project, including false statements about the timing of the Moscow Project, discussions with people in the Company and in Russia about the Moscow Project, and contemplated travel to Russia in connection with the Moscow Project.

(Title 18, United States Code, Section 1001(a)(2).)

ROBERT S. MUELLER, III
Special Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MICHAEL COHEN,

Defendant.

**INFORMATION**

18 Cr. ___

ROBERT S. MUELLER, III
SPECIAL COUNSEL