UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                          :
UNITED STATES OF AMERICA                  :
                                          :
        -  v.  -                          :        18 Cr. 602 (WHP)
                                          :        18 Cr. 850 (WHP)
MICHAEL COHEN,                            :
                                          :
            Defendant.                    :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SENTENCING MEMORANDUM
ON BEHALF OF MICHAEL COHEN**


PETRILLO KLEIN & BOXER LLP

655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330

*Attorneys for Michael Cohen*


Dated: November 30, 2018

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

A SENTENCE OF TIME-SERVED WOULD BE WELL WARRANTED
UNDER 18 U.S.C. § 3553(a) ........................................................................................ 6

    A.  Applicable Legal Standards ............................................................................... 6

    B.  Michael's Personal History and Characteristics ....................................... 7

    C.  The Nature of the Offense Conduct ................................................... 13

    D.  Sentencing Guidelines and Objections to PSR Guidelines Calculation ............ 22

        1.  The PSR's Calculation of the Guidelines Relies on a Flawed
            Grouping Analysis .......................................................................... 22

        2.  Under Section 3553(a), Mitigating Consideration Should be
            Given to Two Overlapping Guidelines Enhancements ........................... 25

    E.  Deterrence Will Not Be Materially Promoted by a Custodial Sentence ............. 26

CONCLUSION ............................................................................................................ 29

i

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Gall v. United States,*
   552 U.S. 38 (2007)..................................................................................7

*Kimbrough v. United States,*
   552 U.S. 85 (2007)..................................................................................7

*Nelson v. United States,*
   55 U.S. 350 (2009)..................................................................................7

*Pepper v. United States,*
   562 U.S. 476 (2011)................................................................................7

*United States v. Booker,*
   543 U.S. 220 (2005)................................................................................6

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008)....................................................................6

*United States v. Dorvee,*
   616 F.3d 174 (2d Cir. 2010)....................................................................6

*United States v. Doxie,*
   813 F.3d 1340 (11th Cir. 2016)..............................................................24

*United States v. Gardellini,*
   545 F.3d 1089 (D.C. Cir. 2008).............................................................29

*United States v. Gordon,*
   291 F.3d 181 (2d Cir. 2002)..................................................................24

*United States v. Jones,*
   531 F.3d 163 (2d Cir. 2008)....................................................................7

*United States v. Lenoci,*
   377 F.3d 246 (2d Cir. 2004)..................................................................23

*United States v. Ministro-Tapia,*
   470 F.3d 137 (2d Cir. 2006)....................................................................6

*United States v. Napoli,*
   179 F.3d 12d Cir. 1999)...............................................................................................23

*United States v. Olis,*
   2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) ...........................................................28

*United States v. Petrillo,*
   237 F.3d 119 (2d Cir. 2000)........................................................................................24

*United States v. Ruiz,*
   2006 WL 1311982 (S.D.N.Y. May 10, 2006) ...........................................................28

*United States v. Stewart,*
   590 F.3d 93 (2d Cir. 2009)..........................................................................................27

We respectfully submit this Memorandum on behalf of our client Michael Cohen in connection with his sentencing proceeding scheduled for December 12, 2018.  On August 21, 2018, this Court accepted Michael's plea of guilty to Information 18 Cr. 602, charging him in eight counts with tax evasion, in violation of 26 U.S.C. § 7201 (Counts One through Five), making false statements to a financial institution, in violation of 18 U.S.C. § 1014 (Count Six), and campaign finance offenses, in violation of 52 U.S.C. §§ 30118(a), 30109(d)(1)(A) (Count Seven), and 52 U.S.C. §§ 30116(a)(1)(A), 30116(a)(7), and 30109(d)(1)(A) (Count Eight).  On November 29, 2018, Michael pleaded guilty before the Honorable Andrew L. Carter, Jr. to a separate Information, 18 Cr. 850, charging him in one count with making false statements to Congress, in violation of 18 U.S.C. § 1001(a)(2).[1]

## PRELIMINARY STATEMENT

Beginning before the entry of his plea on August 21, 2018, and continuing thereafter through late November, Michael participated in seven voluntary interview meetings with the Special Counsel's Office of the Department of Justice ("SCO").  He intends to continue to make himself available to the SCO as and when needed for additional questioning.  He also agreed to plead guilty to an additional count, namely, making false statements to Congress, based in part on information that he voluntarily provided to the SCO in meetings governed by a limited-use immunity proffer agreement.  The SCO is expected to submit a letter to the Court describing its assessment of Michael's cooperation, and the Office of the United States Attorney for the Southern District of New York ("Office") is expected to join with the SCO in presenting Michael's cooperation to the Court as a mitigating sentencing factor under 18 U.S.C. § 3553(a).[2]  Michael's

---

[1] This case was transferred from Judge Carter to this Court for purposes of sentencing.

[2] In the November 29, 2018 Plea Agreement, the SCO "agree[d] to bring to the Court's attention at sentencing . . . the nature and extent of [Michael's] cooperation with [the SCO] on the condition

decision to cooperate and take full responsibility for his own conduct well reflects his personal resolve, notwithstanding past errors, to re-point his internal compass true north toward a productive, ethical and thoroughly law abiding life.

Michael has also voluntarily met twice with representatives of the Office, and responded to questions concerning an ongoing investigation.  In connection with this inquiry, he intends to continue to make himself available as and when needed by the Office.

Michael has similarly met voluntarily with representatives of the New York State Office of the Attorney General ("NYAG") concerning a state court action in which the NYAG has sued the Donald J. Trump Foundation and certain individual defendants, including Donald J. Trump.  He also provided the NYAG with documents concerning a separate open inquiry.  As above, Michael intends to make himself available to the NYAG to provide any additional cooperation it may request in these matters.

Michael, following his plea, additionally waived subpoena and met on an expedited basis with the New York State Department of Taxation and Finance ("DTF"), and has cooperated personally and through counsel and tax professionals with requests for information from DTF.  His cooperation has included a waiver that allowed DTF to forego the burden of issuing subpoenas for materials, including the federal tax revenue adjustment report in this case.

Arising out of Michael's concern that his entry into a traditional cooperation agreement would likely delay his sentencing, as investigations and trials unfold and conclude, he respectfully

---

that [Michael] continues to respond and provide truthful information regarding any and all matters as to which [the SCO] deems relevant."  Nov. 29, 2018 Plea Agr. at 4.  In a supplemental agreement executed the same day, the Office agreed that Michael's "provision of information to the SCO is a factor to be considered by the Court pursuant to Title 18, United States Code, Section 3553(a)," notwithstanding that, by agreement between the parties, the Office is not filing a motion pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines.  Nov. 29, 2018 Supplemental Agr. at 1.

declined to pursue conventional cooperation so that his sentencing proceeding would go forward as scheduled. This personal decision does not signal any intention on Michael's part to withhold information or his availability to respond to additional inquiry. To the contrary, he expects to cooperate further. But, following the execution of search warrants in this case, nearly every professional and commercial relationship that he enjoyed, and a number of long-standing friendships, have vanished. Thus, the necessity, at age 52, to begin his life virtually anew, including developing new means to support his family, convinced Michael to seek an early sentence date, fully understanding that this Court will determine the timing under which his efforts to rebuild will commence.

For what it says about Michael's fortitude and fundamental character, the significance of his cooperation with the SCO falls outside of the ordinary framework in which courts routinely assess cooperation in criminal cases. It states the obvious to observe that this matter is unique. Michael is cooperating in a setting in which the legitimacy of the SCO's investigation – and the rationale for its very existence – is regularly questioned publicly and stridently by the President of the United States. *See, e.g.*, John Wagner, *Trump Attacks Mueller Probe for Fourth Straight Morning, Asks if it will "Go on Forever,"* Washington Post (Nov. 29, 2018, https://www.washingtonpost.com/ politics/trump-attacks-mueller-probe-for-fourth-straight-morning-asks-if-it-will-go-on-forever/ 2018/11/29/96b204ec-f3c9-11e8-bc79-68604ed88993_ story.html); John W. Schoen, *Trump Is Tweeting "Witch Hunt" A Lot More Than He Used To, as Mueller Probe Grinds On and Manafort Goes on Trial*, CNBC.com (Aug. 1, 2018, https://www. cnbc.com/2018/08/01/ trumps-witch-hunt-tweets-are-getting-more-frequent-as-mueller-probe.html). The President routinely denounces the SCO investigation as politically biased and reliant on excessively aggressive prosecutorial tactics. *See, e.g.*, Kevin Liptak, *Trump Says Longstanding Legal Practice of Flipping "Almost Ought to be*

*Illegal,"* CNN.com (Aug. 23, 2018, https://www. cnn.com/2018 /08/23/politics/trump-flipping-outlawed/index.html); Eileen Sullivan, *Trump Criticizes Investigators, Citing "Unrevealed Conflicts of Interest,"* N.Y. Times, (May 7, 2018, https://www.nytimes.com/2018/05/07/us/ politics/trump-special-counsel-inquiry.html).  He also openly criticized his former Attorney General's recusal from the matter on the ground that the former Attorney General should have remained involved and limited or terminated the SCO's work.  *See* Jennifer Hansler, *Trump's Twitter Attacks on Sessions: An Annotated Timeline*, CNN.com (Aug. 25, 2018, https://www. cnn.com/2018/08/25/politics/trump-sessions-twitter-timeline/index. html); Katie Benner, Nicholas Fandos, and Katie Rogers, *Trump Denounces Justice Dept. as Investigations Swirl Around Him*, N.Y. Times, Aug. 24, 2018, at A1; Matt Zapotosky, John Wagner, *Trump Blames Sessions for Russia Probe, Suggests He Could Have Shut It Down*, Washington Post (June 5, 2018, https:// www.washingtonpost.com/politics/trump-blames-sessions-for-russia-probe-suggests-he-could-have-shut-it-down/2018/06/05/19023474-68b2-11e8-bf8c-f9ed2e672adf_story.html).

In the context of this raw, full-bore attack by the most powerful person in the United States, Michael, formerly a confidante and adviser to Mr. Trump, resolved to cooperate, and voluntarily took the first steps toward doing so even before he was charged in this District.  *See* Nov. 28, 2018 Plea Agr. at 8 (proffer agreement with SCO first executed on August 7, 2018).  He took these steps, moreover, despite regular public reports referring to the President's consideration of pardons and pre-pardons in the SCO's investigation.  *See, e.g.*, Sharon LaFraniere and Nicholas Fandos, *Trump Raises Idea of Pardon For Manafort*, N.Y. Times, Nov. 28, 2018, at A1; Carol D. Leonnig and Josh Dawsey, *Trump Recently Sought His Lawyers' Advice on Possibility of Pardoning Manafort, Giuliani Says*, Washington Post (Aug. 23, 2018, https://www.washingtonpost.com/politics/trump-sought-his-lawyers-advice-weeks-ago-on-possibility-of-pardoning-manafort-but-they-counseled-

against-it-giuliani-says/2018/08/ 23/17dce5c6-a70a-11e8-8fac-12e98c13528c_story.html). And, he acted knowing that the result would be personal attacks on him by the President, a bevy of advisers and public relations specialists, and political supporters of the President, *see, e.g.*, David Jackson and John Fritze, *Trump Attacks Former Fixer Michael Cohen as "Weak" and Accuses Him of Lying in Mueller Plea Deal*, USA Today, (Nov. 29, 2019, https://www.usatoday.com/story/news/ politics/2018/11/29/donald-trump-calls-cohen-weak-says-hes-lying-mueller-plea-deal/ 21482334002), as well as threats to him. Although it is true that any decision to cooperate in an investigation directly or indirectly touching a sitting President would be weighty and fraught for any former confidante and associate, here, in the circumstances of this case, at this time, in this climate, Michael's decision to cooperate required and requires singular determination and personal conviction. He could have fought the government and continued to hold to the party line, positioning himself perhaps for a pardon or clemency, but, instead – for himself, his family, and his country – he took personal responsibility for his own wrongdoing and contributed, and is prepared to continue to contribute, to an investigation that he views as thoroughly legitimate and vital.

\*\*\*

We now turn to the additional factors relating to sentencing. Our comments below, respectfully, are intended to be taken in the above-expressed spirit, in which Michael has determined to proceed responsibly and candidly as the continuing investigations unfold. He accepts full responsibility for the offense conduct, and we, as counsel, submit the below considerations in this context. Thus, for example, where we discuss below the exceptionally ***un***sophisticated tax conduct before the Court, we intend not to minimize the significance of the charges, but merely to contrast the case with others, with a view to placing it in the proper comparative perspective with the criminal tax cases that this Court and others routinely adjudicate.

For the reasons set forth below, we respectfully request that the Court, based on (1) the cooperation Michael has provided, (2) his commitment to continue to cooperate, and (3) all of the remaining sentencing factors required to be considered under 18 U.S.C. § 3553(a), impose a sentence of time-served and restitution to the IRS.

## A SENTENCE OF TIME-SERVED WOULD BE WELL WARRANTED UNDER 18 U.S.C. § 3553(a)

### A.     Applicable Legal Standards

Section § 3553(a) provides that the sentence be "sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)." *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*); *see also United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). Those purposes are: (1) the nature of the offense and the history and characteristics of the defendant; (2) the purposes of sentencing, described in § 3553(a)(2) to include (a) the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (b) the need to afford adequate deterrence to criminal conduct; (c) the need to protect the public from future criminal conduct by the defendant; and (d) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines and their policy statements; (5) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution.  18 U.S.C. § 3553(a).

Concerning the Guidelines, post-*United States v. Booker*, 543 U.S. 220 (2005), it is "emphatically clear that the Guidelines are guidelines – that is, they are truly advisory." *Dorvee*, 616 F.3d at 183 (quoting *Cavera*, 550 F.3d at 189) (*en banc*).  Although the Guidelines are to be

given "fair consideration" "before imposing" a sentence, "in the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (internal quotations and citations omitted).  Regarding this individualized assessment, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Indeed, the Court "may vary [from the Guidelines range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotations and citations omitted); *Gall v. United States*, 552 U.S. 38, 47 (2007) (court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range").

   As discussed below, based on these factors, it is respectfully submitted that a sentence of time-served[3] would be well warranted in this case.

### B.    Michael's Personal History and Characteristics

   Michael, age 52, is a first-time offender.  The sole provider for his family, Michael has been married to Laura Cohen for 24 years, and they have two children, Samantha, 23, and Jake, 19.

   Michael is utterly devoted to his family.  Truly, the greatest punishment Michael has

---

[3] Michael was taken into custody on August 21, 2018, the date on which he entered his plea before this Court.  Again, on November 29, 2018, he was taken into custody before the entry of his plea before Judge Carter.

endured in the criminal process has been the shame and anxiety he feels daily from having

subjected his family to the fallout from his case.  The media glare and intrusions on all of them,

including his children, the regular hate correspondence and written and oral threats, the fact that he

will lose his law license, the termination of business relationships by banks and insurers, and the

loss of friendships, are but some of this fallout.

Michael's father survived unimaginable horrors during World War II, including

"bombings, target shooting, hunger and disease, [the] gulags of Siberia, and persecution."  Ex. 1

(Maurice Cohen).[4]  He eventually arrived in Canada and later became a surgeon.  He and his wife, a

surgical nurse, together raised four children.  They both retired about five years ago.  Michael

remains very close to his parents, speaking to them almost daily.  PSR ¶¶ 84-85.[5]  Michael's father

calls his son "the oxygen in the air that I breathe."  Ex. 1 (Maurice Cohen).

Michael describes his children as his "heart" and "soul."  The family is very close-knit, and

Michael and Laura have never spent any extended period apart.  PSR ¶¶ 93-95.  "Michael is first

and foremost deeply committed to his family," Ex. 17 (Faisal Hassan), and has always worked

hard to make sure his wife and children are well-cared for.  *See* Ex. 34 (Steve Weatherford)

("[T]he honor, adoration, and respect he shows his wife Laura, and two children, Samantha and

Jake, set the example I strive every day to attain."); Ex. 30 (Penny Sherman) ("When Michael says

family first he truly means it in every sense of the word."); Ex. 25 (Valerie Rosenwasser)

("Michael represents the true essence of a family man – extremely devoted, dedicated, a loving

---

[4] Letters in support of Michael submitted with this Memorandum as Exhibits are referred to by author name.

[5] "PSR" refers to the Presentence Investigation Report dated November 13, 2018.  We understand that the Probation Department is preparing an amended PSR based on Michael's plea to Information 18 Cr. 850.

husband and father.").

His children's education has always been of the foremost importance to Michael, and "[d]espite his busy work schedule, Michael never missed an opportunity to participate in his children's academic lives." Ex. 24 (Beth Rosenthal); *see also* Ex. 33 (Marea Wachsman) ("I saw, first hand, Michael's devotion to his family and his children as he is determined to see them excel in school, participate in numerous extra curricular activities and give to their community."); Ex. 9 (Erik Ekstein) ("I have never known Michael to miss anything that involves his children.").

Michael has both supported, and used his considerable fundraising skills to urge others to support, Columbia Grammar and Preparatory School, which both of his children attended and where he served on the Board of Trustees, "work[ing] tirelessly on the School's behalf." Ex. 36 (Andrew Zaro). In that role, Michael "went out of his way to ensure that children who[ ] were qualified to have successful academic careers but were not able to afford the tuition were granted [the] necessary financial aid," serving as "a true advocate for children and families in need." Ex. 10 (Brian and Amy France). As one of his fellow Board members describes, "[i]t was purely [Michael's] drive and determination to raise as much money as possible that ensured that the [School's] scholarship fund was fully capitalized," a task he undertook "purely to help the children relying on these scholarships." Ex. 6 (Rona Davis).

Michael's care for children has fueled his support for numerous other charitable causes, such as St. Jude's Children's Research Hospital, "where he has committed many hours of charitable work and has enlisted the help of his children," Ex. 2 (Andrew Albstein); "Operation Smile," "a humanitarian mission to aid refugee children in Jordan in need of surgical intervention," in order to "enjoy a normal childhood and a better life," Ex. 17 (Faisal Hassan); and his friend Steve Weatherford's foundation, through which Michael has "coordinated and assisted

in the execution of speakers, professional athletes, and role models to speak to students in the city of Manhattan," thus advancing the foundation's ability "to change the lives of thousands of students in the Tri-state area."  Ex. 34 (Steve Weatherford).  Cathy Gottlieb Weiss also describes how Michael provided support to her family when her oldest son, ████████████████ ███████████ was applying to college.  "Michael's ongoing guidance led to a successful placement at [her] son's first choice college," and after receiving his education, her son has "continue[d] to thrive" because of Michael's "invaluable" assistance.  Ex. 35 (Cathy Gottlieb Weiss).  Similarly, when his friend Lauren Salerno's daughter ████████████████████████ ████████████ Michael was one of the very first people to contact [her], sit with [her], offer his shoulder to lean on, and help [her] ████████████████████████████."  Ex. 26 (Lauren Salerno); *see also* Ex. 19 (Felix Karafin) ("Michael was the first person to help when my daughter ████████████████████ and he was there for my family every step of the way."); Ex. 32 (Marc and Sandy Taub) ("When our daughter was ████████████████████████████, Michael was there to help make a connection to the right doctor and insure she received the best possible level of care."); Ex. 22 (Sara and Ken Pilot) ("[W]hen a beloved Housekeeper's child ████████████ and could not afford it[,] Michael, without hesitation not only paid ████████████, but visited the child in the hospital and made sure the doctors were the best and most experienced.").

Michael's friends attest to his aid and generosity in assisting them with their own business endeavors.  Kelly Gitter recounts that when she was struggling to make a living as a real estate broker in the aftermath of the financial crisis, "Michael was the first one to help me by putting me in contact with a friend of his," eventually resulting in a successful purchase.  When she attempted to take Michael to dinner as a means of thanking him, "Michael flatly refused and instead

suggested that if I were to do anything on his behalf, it would be to make a donation to St. Jude's Children's Hospital," which she says "taught [her] in that moment what it was to have integrity," and that "there is nothing more authentic than paying it forward." Ex. 13 (Kelly Gitter). Kimberley Green also describes how, when she was starting up a new company, "Michael made it his mission to find me the right people to be involved and that I could trust," so that her business would succeed. Ex. 14 (Kimberley Green). In the same vein, when Laura Sanko was "trying to pursue a career in sports television" but "wasn't sure how to go about it," Michael "immediately began giving me advice on how I might be able to get my foot in the door," "made several introductions on my behalf and played a key role in launching the television career that is now a huge part of my life." Ex. 27 (Laura Sanko); *see also* Ex. 7 (Andrew Dworkin) (Explaining that when he met with Michael to brainstorm about potential job opportunities, "Michael was exceptionally generous with his time, listening to my personal journey with unusual empathy. He went out of his way to better understand my situation, and then introduced me to a number of people who might need a person of my talents, often showcasing me at events while selflessly fading into the background."); Ex. 33 (Marea Wachsman) (Describing that when she was handling a difficult legal case, "Michael made himself available to me to answer my questions, point me in the right direction, and assist me in achieving a successful resolution, without asking or expecting any renumeration [sic] for himself."); Ex. 8 (Robyn and Richard Ebers) (When Robyn Ebers "was starting out in a relatively new business," "Michael was the only person who immediately reached out with a helping hand," and was consistent with his "favorite" refrain: "'What can I do for you?'"); Ex. 11 (Cozy Friedman) ("[W]hen I launched a new business 5 years ago [Michael] was very eager to help me, took time from his incredibly busy schedule to read my business plan and offer advice, as well as to make introductions that proved to be very helpful as I built up my

11

business.").

Among Michael's admirable qualities are his genuine respect for others and interest in

getting to know and helping those from different walks of life.  As David McNeer explains, when

Michael saw a "60 Minutes" broadcast that featured the devastating effect of the Maytag

Company's decision to leave his hometown of Newton, Iowa, Michael reached out to him directly

to see how he could help.  "Being from the Midwest I wasn't quite used to how direct Michael

was," Mr. McNeer states, "[B]ut I soon grew to appreciate it," as Michael assisted him in initiating

new opportunities for his small promotional products business.  Ex. 21 (David McNeer); *see also*

Ex. 37 (David DeAngelis) (Describing how, when he reached out to Michael without any prior

introduction, Michael "took a personal interest in helping my business and placed me in contact

with several vendors. . . . He offered advice and never asked for anything in return.").  Andrew

Albstein recounts having dinner with Michael at a restaurant where "Michael had a lengthy

conversation with one of the employees who sought business advice" from him.  Ex. 2 (Andrew

Albstein); *see also* Ex. 23 (Kathy Presto) (Michael "actively seeks to help others, whether they are

a lifelong friend or someone he's just met."); Ex. 35 (Cathy Gottlieb Weiss) ("Michael treated

everyone the same regardless of what role they played in his life, from the Security Guard at the

school, to the homeless man on the street – Michael always had time for a warm greeting, and

always – a helping hand."); Ex. 19 (Felix Karafin) ("Despite his immeasurable success, Michael is

always relatable and makes others feel special."); Ex. 27 (Laura Sanko) ("I have had several

opportunities to observe how Michael treats those around him.  From the receptionist at his office to

some of the most influential business leaders in the nation, Michael is beloved by many and

deservedly so."); Ex. 3 (Sara Armet) ("I am indebted to Michael Cohen for showing me that

whoever you are, wherever you come from – we all have a story to share.  Michael takes the time to

know your story."); Ex. 15 (Melissa Greenberg) ("I can't tell you how many times for as long as I have known Michael that our dinners, lunches and get togethers would be punctuated with calls from friends and mere acquaintances seeking Michael's help and guidance in their careers or with other personal problems.  And Michael was there for *everyone*, tirelessly and genuinely.").  His friend Jackie Harris describes Michael as "a true gentleman [who] deeply cares about those whose path he crosses, no matter what the relationship.  He treats everyone with the same respect and concern and is very well regarded and beloved by so many people."  Ex. 16 (Jackie Harris).

     **C.**    **The Nature of the Offense Conduct**

*Information 18 Cr. 602: Counts One to Five (Tax Evasion)*

Counts One through Five charge tax evasion in the years 2012 through 2016.  Michael reiterates his personal responsibility for this conduct and apologizes for it to this Court and his family.

As the Court considers this offense conduct for sentencing purposes, we respectfully set forth several observations directed at a comparison of the specific conduct before the Court with the complex and sophisticated offense conduct that characterizes many of the criminal tax cases prosecuted in this and other federal courts.  In so doing, neither we nor Michael minimize the seriousness of tax evasion in any form.  Rather, we respectfully submit that the nature of the instant conduct suggests that, on a comparative basis, it warrants relatively less punishment than cases where sophisticated means and schemes are employed.  Indeed, we submit respectfully that little, if anything, separates the offense conduct from conduct that is routinely pursued through non-criminal enforcement.

As an initial matter, Michael did not find himself in the criminal justice system facing tax charges after audit, an unsatisfied or obstructed demand by the IRS, an investigated history of

sophisticated tax maneuvers and deceptions, or the discovery by the government of offshore or nominee accounts or bogus deductions. Nor was there any meaningful pre-charge process in this case. Michael was notified through counsel of the government's intention to bring criminal tax evasion charges only approximately three or four days before he was told they would be filed. The usual practice of review with counsel and an opportunity to be heard by the Tax Division within DOJ as to the filing of criminal charges was omitted by decision of the government.[6]

In comparison, numerous allegations of unpaid tax are routinely asserted by the IRS outside of the criminal context and addressed through assessments, liens and penalties. On the merits, such an approach could readily have been taken here, because other than the unreported income itself, no aggravating or "plus" factors are present. Thus, this case involves:

1.    No allegation of unreported cash transactions, much less systematic ones;

2.    No allegation of the use of offshore or nominee accounts;

3.    No allegation of phony deductions or expenses run through a business or otherwise;

4.    No allegation of false statements or obstructive or similar conduct during audit or IRS proceedings, or disingenuous tax-driven sham transactions;

5.    No allegation that absurdly minimal tax was paid where substantial sums were actually due;[7]

---

[6] Title 6, Section 4.214, of the Justice Manual (formerly the U.S. Attorney's Manual) states that, "If time and circumstances permit, the Tax Division generally grants a taxpayer's written request for a conference with the Division." Even if the matter has already been forwarded to the U.S. Attorney's Office, the taxpayer may request a conference with that Office. During such a conference, "the Tax Division usually advises [the taxpayer] of the proposed charges, the method of proof, and the income and tax computations that the IRS recommended." The taxpayer may then "present explanations or evidence for the Tax Division to consider in reaching a decision regarding prosecution."

[7] Michael paid approximately $6 million in taxes during the tax years in issue in this case.

6.      No allegation of nonpayment of any penalties or unsatisfied audit assessment; and

7.      No allegation of false responses to a tax preparer's annual questionnaire (no such questionnaires were ever sent to Michael by his accountant).

The means involved here could not have been less sophisticated.  Indeed, the Sentencing Guidelines calculation in the August 21, 2018 Plea Agreement includes no offense level adjustment for "sophisticated means," under U.S.S.G. § 2T1.1(b)(2).  Notably, the Information's core allegation is that Michael "did not provide records that would have allowed Accountant-1 ***to reasonably identify*** [the subject] income."  Information 18 Cr. 602 (WHP) ¶ 8 (bold added).[8] Accordingly, without minimizing the seriousness of tax evasion, no matter its characteristics or size, Michael's case stands out for comparative purposes in that a failure to reasonably identify all income to a tax preparer who received all client-related bank statements is quite different in kind from the sophisticated and complex schemes typical of criminal tax evasion cases.  *See* https://www.justice.gov/tax/about-division ("The Criminal Enforcement Sections [of the Tax Division of the Department of Justice] are staffed with prosecutors who are particularly skilled at investigating, prosecuting and evaluating *complex* financial crime cases.") (emphasis added).

For example, in *United States v. Earl Simmons*, the defendant, a recording artist known as "DMX," engaged in a "brazen, multi-year scheme to fraudulently conceal millions of dollars in income . . . and avoid paying $1.7 million in taxes" by, among other things, (1) "[a]rrang[ing] for hundreds of thousands of dollars of musical royalties to be deposited into the bank accounts of his managers, and then had portions of that money disbursed to himself in cash or used to pay personal expenses," (2) "[r]eceiv[ing] half of concert performance fees into the bank accounts of his

---

[8] Every year, Michael provided his regular accountant with all bank account statements of his personal and business entities, separated by marked tabs, in organized three-ring notebooks.

managers, who then distributed cash to [him], and then typically receiv[ing] the other half himself in cash," (3) demanding payment for his participation in a reality television show without withholding taxes, (4) failing entirely to file personal tax returns during a period when he earned more than $2.3 million, and (5) filing a false personal bankruptcy petition understating his income. Gov't Sent'g Ltr. at 1, 2, ECF No. 35, 17 Cr. 172 (JSR) (S.D.N.Y. Mar. 23, 2018).  In that case, the Court imposed a one-year prison term where the advisory Guidelines range was 57 to 60 months. In another recent case, *United States v. Lacy Doyle*, Judge Carter imposed a sentence of four years' probation where the defendant engaged in a complicated offshore tax evasion scheme that continued over a six-year period and during which she "established and maintained a sham foundation to hold [over $4 million in] Swiss bank accounts in order to conceal those bank accounts from U.S. tax authorities and evade U.S. tax obligations."  Gov't Sent'g Ltr. at 1, ECF No. 110, 16 Cr. 506 (ALC) (S.D.N.Y. Oct. 26, 2018).

To be sure, Michael, as a prominent American and attorney, may have been selected for criminal prosecution to set an example.  But that decision was far from a foreordained exercise of prosecutorial discretion.  In cases of unsophisticated means such as this one, even when the taxpayer is a well-known public figure, the government routinely makes its point through IRS administrative, not criminal, action.  The table below provides a sample of such cases:

| Kaseem "Swizz Beatz" Dean | The music producer paid over $650,000 in back taxes without criminal consequences after the IRS filed liens for two tax years.  *See* https://www.dailymail.co.uk/news/article-3906918/Alicia-Keys-tax-shy-husband-Swizz-Beatz-coughs-650-000-IRS-case.html. |
| --- | --- |
| Floyd Mayweather Jr. | The boxer paid $15.5 million in taxes only after the IRS filed liens against him for unpaid taxes over multiple years, but he did not face criminal charges.  *See* https://www.businessinsider.com/ap-mayweather-has-history-of-tax-woes-7m-from-2010-unresolved-2017-7. |

| Willie Nelson | The IRS claimed singer Willie Nelson owed $16.7 million, but he was permitted to settle for $9 million without facing criminal penalties.  *See* https://www.rollingstone.com/music/music-country/flashback-willie-nelson-settles-irs-tax-debt-196254/. |
| Chris Tucker | The IRS filed a $2.5 million tax lien against the comedian as the result of a multi-year audit, and he was permitted to settle without facing criminal charges.  *See* https://www.cnn.com/2014/09/01/showbiz/chris-tucker-tax-bill/index.html. |
| John Travolta | The actor settled with the IRS and agreed to pay $607,400 in back taxes for disputed losses he claimed over the course of two tax years.  He was not required to pay the $500,000 in penalties sought by the IRS and did not face criminal charges.  *See* https://abcnews.go.com/Entertainment/story?id=112661&page=1. |

Given the absence in the offense conduct of any aggravating facts and circumstances, we respectfully submit that the disparity in treatment that brings Michael before this Court on criminal tax evasion charges while so many others are pursued non-criminally for conduct similar to or more sophisticated than present here, should be considered by the Court in fashioning an appropriate sentence.

### *Information 18 Cr. 602: Count Six: False Statements to a Financial Institution*

Michael and his family had banked with Bank-3[9] for more than a decade, and at the time of the offense conduct Bank-3 held a first mortgage on the Cohens' primary residence.  In early 2015, Michael discussed with Gary Farro, the family's principal private banker, opening a $500,000 home equity line of credit ("HELOC") secured by his primary residence.  At the time, the unencumbered equity value in the residence was more than 10 times that amount.  Mr. Farro supplied Michael and his wife with a form for the HELOC application in which Mr. Farro had already completed certain lines of a balance sheet.  Michael signed the form, without adding to the liability side of the balance

---

[9] In this Memorandum, we use the defined short-form names employed in the two filed Informations.

17

sheet a number of substantial obligations, none of which then encumbered his primary residence. After Michael drew down on the HELOC, he replaced the sums drawn in short order.

Michael's use of the HELOC caused no loss to Bank-3.[10]  And, given the exceptionally favorable (to Bank-3) loan-to-value ratio, a very strong case can be made that Bank-3 incurred no realistic risk of loss during the period of the HELOC.  Nonetheless, Michael recognizes that it was incumbent on him to meet the highest standards in his communications with banks.  Thus, while we respectfully urge the Court to consider the relative significance of the misconduct in this case as a factor in mitigation of sentence, Michael does not distance himself from his conduct or its wrongfulness.

### Information 18 Cr. 602: Counts Seven and Eight: Campaign Finance Violations & Information 18 Cr. 850: Count One: False Statements to Congress

We address the campaign finance and false statements allegations together because both arose from Michael's fierce loyalty to Client-1.  In each case, the conduct was intended to benefit Client-1, in accordance with Client-1's directives.  Michael regrets that his vigor in promoting Client-1's interests in the heat of political battle led him to abandon good judgment and cross legal lines.

### Campaign Finance Violations

The details of the offense conduct captured by Count Seven and Eight are set forth in the charging instrument.  Concerning Count Seven, as relevant here, Michael himself did not make the

---

[10] In his many years of dealing with financial institutions, Michael has never defaulted on a loan, except that in 2018, because he had been trying for *almost eighteen months* to gain Bank-2's focus on a proposed assignment of his medallions-secured loan to a prospective purchaser of his and his wife's taxi medallions, Michael, at wit's end, held back several monthly payments.  Bank-2 finally then focused on the transaction and approved it.  By this time, however, the prospective purchaser, having witnessed the decline in value of NYC taxi medallions over many months, decided not to close.

payment to Woman-1 called for by the agreement reached between Corporation-1 and Woman-1, but participated in planning discussions with Client-1 and the Chairman and CEO of Corporation-1 relating to the payment made by Corporation-1, including obtaining the commitment of Client-1 to repay Corporation-1.  As the matter unfolded, the contract was profitable for Corporation-1, and Client-1's failure to reimburse Corporation-1 was ultimately not contested by Corporation-1.

Concerning Count Eight, Michael made a payment to the lawyer for Woman-2 in coordination with and at the direction of Client-1, and others within the Company.  Michael was assured by Client-1 that he would be repaid for his advance of funds, and, later, again with the approval of Client-1, agreed to an arrangement conceived by an executive of the Company whereby Michael would receive reimbursement during 2017 in the form of monthly payments by the Company for invoiced legal fees.

With respect to the conduct charged in these Counts, Michael kept his client contemporaneously informed and acted on his client's instructions.  This is not an excuse, and Michael accepts that he acted wrongfully.  Nevertheless, we respectfully request that the Court consider that as personal counsel to Client-1, Michael felt obligated to assist Client-1, on Client-1's instruction, to attempt to prevent Woman-1 and Woman-2 from disseminating narratives that would adversely affect the Campaign ***and*** cause personal embarrassment to Client-1 and his family.  In this sense, Michael's conduct was different in kind from recent campaign finance charges brought before this Court, in which the charged individuals used straw donors to make illegal campaign contributions.  *See United States v. Dinesh D'Souza*, 14 Cr. 34 (RMB) (defendant sentenced to five years' probation for using straw donors to contribute to Republican Senate candidate's campaign); *United States v. Jia Hou and Xing Wu Pan*, 12 Cr. 153 (RJS) (defendants sentenced to ten months' and four months' imprisonment for involvement in scheme to use straw donors to raise money for

mayoral campaign of John Liu).[11]

### *False Statements to Congress*

Michael's false statements to Congress likewise sprung regrettably from Michael's effort, as a loyal ally and then-champion of Client-1, to support and advance Client-1's political messaging. At the time that he was requested to appear before the Senate Select Committee on Intelligence and House Permanent Select Committee on Intelligence, Michael was serving as personal attorney to the President, and followed daily the political messages that both Client-1 and his staff and supporters repeatedly and forcefully broadcast. Furthermore, in the weeks during which his then-counsel prepared his written response to the Congressional Committees, Michael remained in close and regular contact with White House-based staff and legal counsel to Client-1.

As such, he was (a) fully aware of Client-1's repeated disavowals of commercial and

---

[11] Michael's loyal service to his famous former client is well-known amongst his friends, as is that the relationship has now led to a criminal case. *See, e.g.*, Ex. 8 (Robyn and Richard Ebers) (noting "Michael's overwhelming loyalty" to Trump as well as the "destructiveness caused by Michael's relationship with Mr. Trump."); Ex. 17 (Faisal Hassan) (Michael's "greatest weakness has been his blind loyalty towards those who have misused his trust and his good name."); Ex. 2 (Andrew Albstein) ("Unfortunately, because of his unwavering and zealous commitment to provide excellence for his employer, Michael soon became the easiest person to blame, by those who needed a person to blame."); Ex. 14 (Kimberley Green) ("Michael's greatest characteristic, yet also on occasion his Achilles heel, is his staunch loyalty. When he is behind you it is unfaltering, at times to his detriment."). Michael's friend Ethan Gerber, who is a practicing lawyer and former President of the Brooklyn Bar Association, writes, "[a]s to his involvement in the Trump Organization, to those who knew Michael outside of his current fame or notoriety, the assumption is that if he erred in his representation it is because he was overly loyal and zealous on behalf of his client. As a member of a Grievance Committee I have seen many attorneys succumb to the wishes of a particularly persuasive client," and Michael "had a client whose extraordinary power of persuasion got him elected to the highest office in the land." Ex. 12 (Ethan Gerber); *see also* Ex. 5 (Cory Colligan) ("His loyalty to Mr. Trump . . . was immeasurable. He spoke of him constantly. It was obvious he was in CONSTANT contact with him running ideas, proposals, etc. by him for his approval.").

political ties between himself and Russia, as well as the strongly voiced mantra of Client-1 that investigations of such ties were politically motivated and without evidentiary support, and (b) specifically knew, consistent with Client-1's aim to dismiss and minimize the merit of the SCO investigation, that Client-1 and his public spokespersons were seeking to portray contact with Russian representatives in any form by Client-1, the Campaign or the Trump Organization as having effectively terminated before the Iowa caucuses of February 1, 2016.

Seeking to stay in line with this message, Michael told Congress that his communications and efforts to finalize a building project in Moscow on behalf of the Trump Organization, which he began pursuing in 2015, had come to an end in January 2016, when a general inquiry he made to the Kremlin went unanswered.  He also stated that his communications with Client-1 and others in the Trump Organization regarding the project were minimal and ceased at or about the same time. In fact, Michael had a lengthy substantive conversation with the personal assistant to a Kremlin official following his outreach in January 2016, engaged in additional communications concerning the project as late as June 2016, and kept Client-1 apprised of these communications.  He and Client-1 also discussed possible travel to Russia in the summer of 2016, and Michael took steps to clear dates for such travel.

In the heated political environment of the moment and understanding the public message that Client-1 wished to propagate, Michael, in his written statement to Congress, foreshortened the chronology of events and his communications with Client-1 to characterize both as having terminated before the Iowa caucuses.  At the time, Michael justified his false summary of the matter on the ground that the Moscow project ultimately did not go forward.  He recognizes that his judgment was fundamentally wrong, and wishes both to apologize and set the record straight.

### D.     Sentencing Guidelines and Objections to PSR Guidelines Calculation

We respectfully submit two comments regarding the Guidelines calculation set forth in the

PSR issued in connection with Information 18 Cr. 602.

### 1.   The PSR's Calculation of the Guidelines Relies on a Flawed Grouping Analysis.

Probation has calculated the total offense level as 24, resulting in an advisory Guidelines

range of 51 to 63 months, based on an analysis that groups all eight counts in Information 18 Cr.

602.  For the reasons set forth below, this analysis is flawed and the correct offense level is 23,

resulting in a Guidelines range of 46 to 57 months.[12]

Pursuant to U.S.S.G. § 3D1.1, in a multi-count case, (i) "closely related" counts are grouped

under § 3D1.2; (ii) an offense level for each group is determined under § 3D1.3; and (iii) the

offense level applicable to all groups taken together is assessed under § 3D1.4.  Counts are

considered "closely related" under the Guidelines when they involve "substantially the same harm."

U.S.S.G. § 3D1.2.

The tax evasion counts (Counts One through Five) do not involve money related to the false

statement (Count Six) and campaign finance counts (Counts Seven and Eight).  As such, only the

false statement and campaign finance counts are "closely related" and should be grouped under §

3D1.2(d), because the "offense level [for both sets of counts] is determined largely on the basis of

the total amount of harm or loss" as calculated under § 2B1.1, and the offenses are "of the same

general type."  U.S.S.G. § 3D1.2(d) comment. 6.[13]

---

[12] As set forth in the August 21, 2018 Plea Agreement, there is no stipulation between the parties regarding the grouping of the tax evasion counts, on the one hand, and the false statement and campaign finance counts, on the other.  (*See* Aug. 21, 2018 Plea Agr. at 3 n.2).

[13] The parties agree that subsection (d) is the only applicable grouping provision.  The tax evasion counts are not subject to grouping with the false statement and campaign finance counts pursuant to

22

By contrast, for grouping purposes, the tax evasion counts should be viewed as completely separate from the false statement and campaign finance counts.  The unreported income that forms the basis of the tax evasion counts did not arise from the conduct underlying either the false statement count or the campaign finance counts.  And, the amount of loss in respect of the tax evasion counts is calculated under a separate table at § 2T4.1, which is different from the table at § 2B1.1.  In this circumstance, grouping of all of the counts in Information 18 Cr. 602 under subsection (d) is not appropriate.  Nor is it mandatory, notwithstanding that the Guidelines applicable to all of the charged offenses are listed in subsection (d).[14]  *See United States v. Napoli*, 179 F.3d 1, 9 n.4 (2d Cir. 1999) ("We . . . reject the broad view that money laundering and fraud counts can be grouped under subsection (d) simply because they both appear on its list of counts 'to be grouped.'"); *see also United States v. Lenoci*, 377 F.3d 246, 252-53 (2d Cir. 2004) (noting that grouping of Guidelines on the "to be grouped" list in subsection (d) cannot be automatic because such a finding is inconsistent with the "careful [grouping] analysis" undertaken in prior cases and the language of Application Note 6 of the guideline).  Indeed, a contrary approach would be unfair and unconvincing because it would afford undue weight to the application of two upward adjustments – for special skill and sophisticated means – which relate factually solely to the conduct underlying the campaign finance counts, not the tax evasion counts.

---

§ 3D1.2(a) or (b) because they do not involve the same victim or the same act or transactions, or a series of acts or transactions connected by a common objective or constituting a common scheme. Subsection (c), which covers grouping of one count that "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts" with that other count, on its own terms does not apply to the counts in the Information.

[14]  As set forth in the August 21, 2018 Plea Agreement, the applicable Guideline for the tax counts is U.S.S.G. § 2T1.1, for the false statement count, § 2B1.1, and for the campaign finance counts, § 2C1.8.

Notably, even where tax counts arise from the unreported proceeds of a fraud scheme –
which is not the case here – the vast majority of Circuit courts to consider the issue have held that
fraud counts and tax counts should not be grouped together, both because they use different loss
tables, and because they are not "closely related" as a factual matter. *See United States v. Doxie*,
813 F.3d 1340, 1345 (11th Cir. 2016) (collecting cases).

*United States v. Petrillo*, 237 F.3d 119, 125 (2d Cir. 2000), is not to the contrary. There, the
defendant's tax and fraud offenses were properly grouped together under § 3D1.2(d), because "the
offenses [at issue] were both frauds, were part of a single continuous course of criminal activity and
involved the same funds." In addition, *Petrillo* was decided at a time when the tax table and the
fraud table "trigger[ed] substantially identical offense level increments based on the amount of
loss," which is no longer the case. *Id.* Moreover, in a concurring opinion issued after *Petrillo*,
Judge Newman noted that it is not clear whether even factually-related tax evasion and fraud counts
should be grouped, and he urged the Sentencing Commission to issue guidance on the topic.
*United States v. Gordon*, 291 F.3d 181, 198 (2d Cir. 2002) ("Ultimately, the Commission needs to
cut through this morass and tell us in plain English whether it wants tax offense group with the
offenses that produced the income on which the taxes were evaded.") (Newman, J., concurring).

Accordingly, the tax evasion counts, on the one hand, and the false statement and campaign
finance counts, on the other, should not be grouped, resulting in a Guidelines range of 46 to 57
months' imprisonment.

2.   Under Section 3553(a), Mitigating Consideration Should be Given to
     Two Overlapping Guidelines Enhancements.

The Probation Department and August 21, 2018 Plea Agreement applied two separate two-
level enhancements to the Count Eight offense conduct:  (1) sophisticated means, under U.S.S.G. §
2B1.1(b)(10), and (2) use of a special skill, under § 3B1.3.  *See* Aug. 21, 2018 Plea Agr. at 4.  On

the facts of this case, the application of both enhancements results in an overstated total offense level, and we respectfully request that the Court consider the same as a mitigating sentencing factor under § 3553(a).

First, the two enhancements apply factually only to the campaign finance violation charged in Count Eight of Information 18 Cr. 602.  To the extent the government's view of the grouping analysis were to be adopted by the Court – which, as we submit above, it should not be – these two enhancements would have the effect of disproportionately reflecting Count Eight in the Guidelines calculation.

Second, the two enhancements address overlapping conduct.  The "sophisticated means" are described as Michael's (i) use of a third-party entity – Essential Consultants LLC, incorporated by Michael in 2016[15] – to make a $130,000 payment on behalf of Client-1, that was described in wire instructions as payment of a "retainer" to Attorney-1, PSR ¶¶ 43-45, and (ii) at the request of Executive-1 of the Company, the submission of "invoices" during 2017 purportedly for legal services rendered, but really to obtain payment and repayment of amounts owed by the Company to Michael, including the $130,000 payment.  PSR ¶¶ 48-52.  At the same time, the "use of a special skill" is described as Michael's use of his status as an attorney to "facilitate and conceal" the campaign finance offense in Count Eight by characterizing the payment and repayments as payments for legal services.  PSR ¶¶ 50-51.  Thus, the facts underlying the special skill adjustment are subsumed within the sophisticated means enhancement.  *Cf.* U.S.S.G. § 3B1.3 (precluding application of the two-level enhancement when a defendant's special skill "is included in the base

---

[15] Michael originally incorporated an LLC called Resolution Consultants LLC in September 2016, but changed the name to Essential Consultants LLC in October 2016 after realizing that a friend owned a business under the prior name.  Michael did not attempt to conceal his role in or relationship to the LLC; he was and is listed as its sole managing member.

offense level or specific offense characteristic."). Accordingly, application of both enhancements would cause an overstatement of the total offense level under the Guidelines.

### E. Deterrence Will Not Be Materially Promoted by a Custodial Sentence

In the circumstances of this case and defendant, we respectfully submit that a sentence of time-served would serve the purpose of deterrence.

With respect to specific deterrence, there is scant risk of recidivism in Michael's case; he has never had any prior interactions with law enforcement, other than a speeding ticket in 1985. Moreover, as publicly reported, from the time of the FBI searches through the culmination of this case, Michael has consistently shown his respect for members of law enforcement and their mission. And, his cooperation in numerous meetings with three different prosecutorial bodies demonstrates his commitment to set the record straight and assist in the government's various inquiries.

Moreover, from the time of the execution of the search warrants in early April of this year, this case has caused deep and lasting strain for Michael and his family. They have been subjected to daily public scrutiny and moral opprobrium in a media cauldron of exceptional heat and intensity. This scrutiny has been accompanied by threats of physical harm to Michael and his family, which have been referred to the authorities for investigation. All of this amounts to an alternative form of punishment that will act as a deterrent against future missteps. *See, e.g.*, Ex. 7 (Andrew Dworkin) ("I suspect the pain [Michael's] mistakes have caused his wife and children is a very real and incalculable punishment he must live with for the remainder of his life. I remain confident that . . . Michael will use this experience to become a better person, and continue living his life as a loving and devoted husband and father, supportive and valued friend, and meaningful and important positive contributor to society."); Ex. 26 (Lauren Salerno) ("We can only hope to

26

emphasize what a valued community member, parent and friend Michael is, and even while he is

dealing with these current and very publicized issues, he continues to be the most dependable,

supportive, and caring friend."); *cf. United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the

need for further deterrence and protection of the public is lessened because the conviction itself

already visits substantial punishment of the defendant").

Moreover, the letters submitted with this Memorandum on Michael's behalf provide

telling insight into his essential character.  *See, e.g.*, Ex. 31 (Jan Sigmon) ("In the decades I have

known Michael, I have never known him to be anything less than kind, generous and giving of

himself to others."); Ex. 10 (Brian and Amy France) ("Michael has always and consistently

displayed an enormous level of kindness, humility, consideration and empathy for others,

including our family and our children."); Ex. 34 (Steve Weatherford) ("Michael has led me and

others by example every single day.  His heart is one that desires to serve others, and acts upon

those desires over and over again."); Ex. 16 (Jackie Harris) ("Michael Cohen is a truly caring

person who does for others out of his huge heart and not because of anything he may receive in

return. . . . I am writing to ask that you consider the tremendous impact he has every day on his

family and his friends when deliberating his case."); Ex. 24 (Beth Rosenthal) ("After knowing

Michael for 40 years, it would take a novel for me to list all his good deeds, so I will close this

letter stating unequivocally that Michael is an upstanding, honorable, salt of the earth man and it

has been a privilege to call him a friend who is like family for all these years."); Ex. 14

(Kimberley Green ("Michael is a selfless caretaker.  He gives of himself endlessly without

complaint and does not ask for anything in return.  That is the way he has always been since I met

him 35 years ago."); Ex. 4 (Raffi Arslanian) ("The outstanding quality that I find stellar in

Michael is his selfless appetite to run to people's aid in time of his friends['] need.  Michael does

not wait to be asked for the help or assistance.").

The observations expressed in these and other of the submitted letters provide every reason to believe that Michael will not re-offend, a conclusion only buttressed by his age, *see United States v. Ruiz*, 04 Cr. 1146 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."), his lack of any criminal history, and his substantial familial obligations. *See United States v. Olis*, 03 Cr. 217 (SL), 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (granting significant downward variance where the "need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

A sentence of imprisonment is also unnecessary to further the objective of general deterrence. A reasonable person in the community viewing this case in full would understand its gargantuan cost to Michael, independent of any prison term. Aside from the enormous pain and stress this case has visited on Michael's family, including his son, who has just begun college, Michael (1) stands to lose his law license; (2) faces IRS civil penalties in addition to the restitution that is ordered by the Court; (3) will be named in a parallel tax case brought by New York State, with likely restitution, penalties and interest; (4) lost all of the business of his consulting firm; and (5) had numerous banking, credit card and insurance agreements canceled. Additionally, a number of long-term friendships have come to an end. No rational person would take any message from this case other than that similar conduct risks devastating, fundamentally life-changing results.

As important, the facts and circumstances surrounding this case are unique and

unprecedented, involving, among other things, the former personal attorney to the sitting

President, campaign finance violations centered on extramarital affairs of a presidential candidate,

and congressional testimony in an exceptionally heated political environment.  Given this singular

context, there is little reason to conclude that general deterrence will be affected by the sentence.

*See United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (rejecting government's

contention that affirming a probationary sentence imposed in criminal tax case would lessen

deterrent value of criminal law "because it elevates one § 3553(a) factor – deterrence – above all

others.  As § 3553(a) makes clear, the district court at sentencing must consider and balance a

number of factors – not all of which will point in the same direction.").

## CONCLUSION

For all of the reasons set forth above, we respectfully request that this Court

sentence Michael to time served.

Dated:  November 30, 2018                    Respectfully submitted,
        New York, New York

                                             PETRILLO KLEIN & BOXER LLP

                                             By: _____

                                             Guy Petrillo
                                             gpetrillo@pkbllp.com

                                             _____

                                             Amy Lester
                                             alester@pkbllp.com

                                             655 Third Avenue, 22nd Floor
                                             New York, New York 10017
                                             Telephone:  (212) 370-0330