ICCQCOHs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA
                 v.                          18 CR 602 (WHP)
                                             18 CR 850 (WHP)
                                             Sentence
MICHAEL COHEN

                    Defendant
------------------------------x

                                             New York, N.Y.
                                             December 12, 2018
                                             11:00 a.m.

Before:
                    HON. WILLIAM H. PAULEY III
                                        District Judge


                         APPEARANCES
ROBERT KHUZAMI
        Acting United States Attorney for the
        Southern District of New York
NICOLAS ROOS
THOMAS McKAY
RACHEL MAIMIN
ANDREA GRISWOLD
        Assistant United States Attorneys


UNITED STATES DEPARTMENT OF JUSTICE
        Special Counsel's Office
JEANNIE S. RHEE
ANDREW D. GOLDSTEIN
L. RUSH ATKINSON
        Assistant United States Attorneys


PETRILLO KLEIN & BOXER LLP
        Attorneys for Defendant
GUY PETRILLO
AMY LESTER

-Also Present-
HEATHER D'AGOSTINO, FBI
MICKEY ROBINSON, FBI

ICCQCOHs

```
 1            (Case called)
 2            DEPUTY CLERK:  Appearances for the United States
 3   Attorney's Office.
 4            MR. ROOS:  For the United States Attorney's Office,
 5   good morning.
 6            Nicolas Roos, Thomas McKay, Rachel Maimin and Andrea
 7   Griswold.
 8            DEPUTY CLERK:  Appearances for Special Counsel's
 9   Office.
10            MS. RHEE:  Jeannie Rhee on behalf of Special Counsel's
11   Office.  I'm joined here today by Andrew Goldstein and Rush
12   Atkinson.  Also in the courtroom in the back, we're joined by
13   FBI Heather D'Agostino and Mickey Robinson.
14            DEPUTY CLERK:  Appearances for the defendant.
15            MR. PETRILLO:  Good morning, your Honor.
16            Guy Petrillo and Amy Lester for Michael Cohen.
17            THE COURT:  Good morning to all of you, and I note the
18   presence of the defendant, Mr. Cohen, at counsel table.
19            This matter is on for sentencing.  Are the parties
20   ready to proceed?
21            MR. ROOS:  Yes, your Honor.
22            MR. PETRILLO:  Yes, your Honor.
23            MS. RHEE:  Yes, your Honor.
24            THE COURT:  First, Mr. Petrillo, have you reviewed
25   with your client the presentence investigation report?
```

ICCQCOHs

 1          MR. PETRILLO:  I have, your Honor.

 2          THE COURT:  Are there any factual matters set forth in

 3     the report that you believe warrant modification or correction?

 4          MR. PETRILLO:  Not at this time, your Honor.  Thank

 5     you.

 6          THE COURT:  Mr. Roos, are there any factual matters

 7     set forth in the presentence report that the government

 8     believes warrant modification or correction?

 9          MR. ROOS:  No, your Honor.

10          THE COURT:  What about the Special Counsel's Office?

11          MS. RHEE:  No, your Honor.

12          THE COURT:  Very well.

13          MR. PETRILLO:  Your Honor, just to confirm, did the

14     Court receive our letter of last night?

15          THE COURT:  I did.

16          MR. PETRILLO:  Very well.

17          THE COURT:  I did.

18          Now, the parties here, before I hear from them, have a

19     difference of opinion concerning the guidelines calculation,

20     and, in particular, the grouping analysis for 18 CR 602.

21          Defense counsel argues that the tax evasion counts are

22     not closely related to the other counts and, therefore, should

23     not be grouped together.  The government counters that Section

24     3D1.2 specifically enumerates guidelines that are to be

25     grouped, which include Section 2T1.1 for the tax evasion

ICCQCOHs

counts, Section 2B1.1 for the false statement count, and

Section 2C1.8 for the illegal campaign contributions counts.

This Court finds the government's argument to be

correct as a matter of law where the offense levels are

principally determined by the amount of loss.  *See United*

*States v. Gordon*, 291 F.3d 181, 192 (2d.Cir 2002).

Accordingly, this Court makes the following guidelines

calculations:  Grouping all eight counts of 18 CR 602 together,

the base offense level is 7.  Because the loss here exceeded

$1.5 million, but was less than $3.5 million, an increase of 16

levels is warranted.

Further, because the offense involved the use of

sophisticated means, including Mr. Cohen's creation of shell

companies and fake invoices, a further two-level enhancement is

appropriate.

Finally, because Mr. Cohen used special skills as a

licensed attorney to facilitate the commission and concealment

of these offenses, a further two-level enhancement is

warranted.  Thus, the adjusted offense level for group one,

that is, the counts charged in 18 CR 602, is 27.

Now, Mr. Cohen pled guilty to these crimes in a timely

manner before me and, accordingly, I grant him a three-level

reduction for acceptance of responsibility.  Thus, his total

offense level is 24.  The defendant has no prior criminal

convictions, and, therefore, his Criminal History Category is a

ICCQCOHs

1   I.  With a total offense level of 24 and a Criminal History

2   Category of I, Mr. Cohen's guideline range is 51 to 63 months

3   of imprisonment on the eight charges of income tax evasion,

4   making false statements to a banking institution, and the two

5   campaign finance crimes.

6          Now, with respect to Mr. Cohen's plea to making false

7   statements to Congress, that is separately grouped and has a

8   base offense level of 6.  This Court agrees with the Special

9   Counsel's Office and Mr. Cohen that no enhancements are

10   appropriate.  Mr. Cohen pled guilty to this crime before my

11   colleague, Judge Carter, and, accordingly, I grant him a

12   two-level reduction for acceptance of responsibility on this

13   offense.  So, with a total offense level of 4 and a Criminal

14   History Category of I, his guidelines range for making false

15   statements to Congress is zero to six months of imprisonment.

16   Accordingly, no multiple account adjustment applies.

17          And so with the guidelines calculation resolved, I

18   will hear now from the parties.

19          Mr. Petrillo, do you wish to be heard on behalf of

20   Mr. Cohen?

21          MR. PETRILLO:  I do, your Honor.  Thank you.

22          Your Honor, may it please the Court, thank you.

23          My partner, Amy Lester, and I have the privilege of

24   representing Michael Cohen and the honor of having met some of

25   the members of his family who are present here today.  The

ICCQCOHs

1  group is larger than I've met, but it includes his mother and

2  father, his mother-in-law and his father-in-law, his wife and

3  children, and his brother and sisters, along with a niece and a

4  cousin.

5          Your Honor, we have made a sentencing submission with

6  numerous letters in support of the character of Mr. Cohen, and

7  it would not be our purpose today to repeat all of what we have

8  already written.  Rather, unless your Honor would like me to

9  proceed otherwise, I would like first to address the remarkable

10  nature and significance of the life decision made by Mr. Cohen

11  to cooperate with the DOJ Special Counsel and the relevance

12  and, respectfully, the importance of that cooperation, not only

13  to this specific man and your Honor's evaluation of this

14  specific man, but also to the Court's consideration of how

15  Mr. Cohen's cooperation promotes respect for law and the

16  courage of the individual to stand up to power and influence.

17          When Mr. Cohen authorized us to contact the Special

18  Counsel's Office in July, he did so to offer his relevant

19  knowledge to the investigation knowing that he would face as a

20  result when his offer became public a barrage of attack by the

21  President.  He knew that the President might shut down the

22  investigation, and he knew that there might come a time when he

23  would appear in court, and there would be no Special Counsel to

24  stand up for him, as there is today.

25          He moved forward nonetheless.  So it is true, as has

ICCQCOHs

1    been pointed out by the government, that part of what Mr. Cohen

2    did in coming forward is similar to what many folks who are

3    expecting criminal charges do in that expectation.  At that

4    time he acknowledged that it was more than possible that his

5    case might proceed from mere investigation to charges and that

6    his offer to assist could help him in some fashion should there

7    be charges and should there be a proceeding.  But it is also

8    the case that his decision was an importantly different

9    decision from the usual decision to cooperate.  He came forward

10   to offer evidence against the most powerful person in our

11   country.  He did so not knowing what the result would be, not

12   knowing how the politics would play out, and not knowing

13   whether the Special Counsel would even survive, nor could he

14   anticipate the full measure of attack that has been made

15   against him; not only by the President, who continues to say

16   that people like Mr. Cohen who cooperate with the Special

17   Counsel are weaklings and those who hold fast and clam up are

18   heroes, but also attacks by partisans and by citizens who

19   happen to be aligned with the President.  And those attacks

20   have included threats against him and his family.

21          So, respectfully, this is not a standard case of

22   cooperation.  The cooperation here should be viewed under a

23   non-standard or in a non-standard framework.  The SCO's

24   investigation, the Special Counsel's investigation is of the

25   utmost national significance, no less than seen 40 plus years

ICCQCOHs

1    ago in the days of Watergate.  In the light of that reality,

2    respectfully, your Honor, it is important that others in

3    Mr. Cohen's position who provide assistance to this historic

4    inquiry take renewed courage from this proceeding, and that law

5    enforcement and the promotion of respect for law also receive a

6    boost from what happens here today.  Mr. Cohen would want me to

7    say that he's always respected law enforcement.  He's always

8    supported it.

9             In the plea agreement with the Special Counsel, the

10   Special Counsel committed, subject to conditions that have been

11   fully satisfied, to bring to your Honor's attention for

12   sentencing purposes in both cases the nature and extent of

13   Mr. Cohen's cooperation with that office.  The Special Counsel

14   says Mr. Cohen has gone to significant lengths to assist the

15   investigation, providing information on core topics under

16   investigation, and is committed to continue to assist.

17            The office says the information provided has been

18   credible and consistent with other evidence obtained in its

19   investigation.  The office further says that it has been useful

20   cooperation in four specific respects that are detailed in the

21   Special Counsel letter to the Court.  And, finally, Mr. Cohen,

22   according to the Special Counsel, has made substantial and

23   significant efforts to remediate his own misconduct, accept

24   responsibility for his actions, and assist the Special

25   Counsel's investigation.

ICCQCOHs

1            Even the Southern District which has submitted a

2    somewhat sharp memo, which I will comment on in a few minutes,

3    to the Court, agrees that Mr. Cohen's assistance to the Special

4    Counsel was significant.  That's at page 17 of its memo.  And

5    that his provision of information to law enforcement in matters

6    of national interest is deserving of credit.  And that's at

7    page 37 of the memo.

8            Your Honor, in this exceptionally important matter,

9    Mr. Cohen's cooperation is overwhelmingly the factor, we

10   submit, that should substantially mitigate his sentence, and

11   his action stands in profound contrast to the decision of some

12   others not to cooperate and allegedly to double deal while

13   pretending to cooperate.

14           But that's not all.  We also ask the Court

15   respectfully that it consider Mr. Cohen's life of good works as

16   it considers the sentence in this case.  As we set forth in our

17   memo, and as supported by the letters sent with the memo, he

18   has been a prodigious fundraiser for the St. Jude's Children's

19   Hospital.

20           He has been the key figure at a Manhattan private

21   school in the raising of funds committed to financial aid for

22   students without means to attend and who otherwise would not be

23   able to attend absent his efforts.

24           He has done likewise impressive fundraising for

25   Operation Smile and assisted the Weatherford Foundation with

10

ICCQCOHs

active personal efforts to advance the role model program of
that athletes' organization.

Your Honor has read, I have no doubt, of the aid and
assistance Mr. Cohen provides regularly to children and friends
when they need to find medical care and stands by them in their
times of illness and hard times.

Whatever millions of words are said and written about
Mr. Cohen, and certainly he's in the paper every day, and on TV
there's coverage, sometimes it appears 24/7, this is a man of
generous spirit and the submissions to the Court demonstrate
that.

There is some mention in the Southern District's memo
regarding emphasis on his own contributions financially, but I
don't find it in our memo.  The crux of what we're saying is
that he puts himself out to raise money for very, very
worthwhile organizations.  He puts his whole body into it, and
this is a man whose first instinct is to help.

When it comes to Mr. Cohen's capacity to follow
through in his commitment to lead a good and law-abiding life,
I would also like to underscore what the Court has been
informed of by several members of the bar.  All portray a man
of integrity and honorable intentions and care for the
underserved, a man who does not engage in sharp business
practices.

To be sure, the Southern District points out that like

ICCQCOHs

many clients that lawyers meet from time to time, Mr. Cohen has

occasionally erupted in frustration at what he perceives to be

wrongs.  For example, as the Southern District points out, he

became very angry when a bank refused to focus on a transaction

that would have allowed him to sell his taxi medallions at a

time when doing so would have been lucrative, waited so long

before they approved the transactions, that the transaction

melted away as the market dipped.  He expressed frustration,

and that is cited in the Southern District's memo as evidence

of a bad character.  I have so many clients who come into my

office on a regular basis frustrated with life.  That's an

immature and meaningless observation in my view as to his

character.  It's simplistic and it's unfair.

        Mr. Alpstein says, a lawyer who's worked with

Mr. Cohen on transactions, "Every seller of a transaction on

which I've represented Michael would say without equivocation

that Michael was and is an honest, responsible, and fair

businessman."

        The man is 52 years old.  There's a long record of how

he has conducted himself in business and with financial

institutions.  No bank has ever lost money dealing with Michael

Cohen.  I'll say that again:  No bank has ever lost money

dealing with Michael Cohen.  No friend in need has ever been

turned away.

        Your Honor, we addressed the offense conduct, and I

ICCQCOHs

| | |
|---|---|
| 1 | had not planned to say more than a few words about it until I |
| 2 | read the Southern District's memo, and I just want to say few |
| 3 | words in response to the memo.  And I don't want to belabor it; |
| 4 | I know that you've read all the materials.  No one is saying, |
| 5 | least of all, Michael Cohen, or has said that a false statement |
| 6 | to a bank is other than serious.  In this case, we simply made |
| 7 | the point that the home equity line of credit as to which the |
| 8 | application was false was ten times oversecured at the time of |
| 9 | the application and that no money damage resulted.  Does that |
| 10 | make it right?  No.  It does not make it right.  But it puts |
| 11 | the conduct into some kind of proportion. |
| 12 | No one is saying, least of us, Michael Cohen, that tax |
| 13 | evasion of any kind is other than serious.  The speaking |
| 14 | information in this case, however, says that the crux of the |
| 15 | conduct was failing to identify deposits as income to an |
| 16 | accountant who received bank statements.  Does that make it |
| 17 | right?  No.  It doesn't make it right.  But it puts in |
| 18 | proportion and points out that the Court here is not dealing |
| 19 | with a mastermind of tax deception. |
| 20 | Ms. Lester and I were given three to four days to |
| 21 | speak to the tax charges in this case before they were filed. |
| 22 | They were not specified.  When asked questions about what they |
| 23 | entailed, I was met with stony silence and no realistic |
| 24 | opportunity to meet with the tax division, as is common.  I |
| 25 | believe that we would have had a very strong chance of |

1     diverting the case from the criminal track had we had that

2     opportunity.

3              But life is tough and Michael Cohen accepts that.  We

4     accept it.  Our point is not to explain the conduct away.  Our

5     point is to say that the offense is well within the heartland

6     of cases that are routinely treated in a non-criminal context,

7     solely so that your Honor can consider the punishment aspect

8     associated with the criminal tax evasion that has been

9     admitted, and that no one is trying to push away as someone

10    else's fault.

11             I will say very little on the campaign charges, the

12    campaign finance charges, and the statement to the legislature.

13    I do want to point out what Mr. Gerber, a lawyer in New York,

14    writes to the Court.  He's a former member of the grievance

15    committee, and he's written on behalf of Mr. Cohen that he's

16    seen many attorneys succumb to the wishes of a particularly

17    persuasive client.  "Mr. Cohen," he writes, "had a client whose

18    extraordinary power of persuasion got him elected to the

19    highest office in the land."  Again, the conduct is quite

20    serious, but Mr. Gerber's experience is certainly worthy of

21    note, as the Court takes into account the human element of what

22    happened here.

23             Based on all these factors, your Honor, most

24    importantly cooperation, good works, and the nature of the

25    offenses, we respectfully submit that the case calls for a full

ICCQCOHs

1    consideration of mercy as your Honor sentences our client,

2    Michael Cohen.

3            A few words on what the Southern District has

4    submitted.  It is not the case that Mr. Cohen has declined to

5    answer questions from the Southern District or from our duly

6    authorized U.S. Attorney's Offices, state law enforcement

7    entities, and Congress.  He's ready to do that.  He is wary of

8    a long-term cooperation agreement for personal reasons and

9    because he wants both to remove himself and to remove his

10   family from the glare of the cameras and try to work his way

11   and their way back from an abnormal life.  The period of such

12   an agreement would be indeterminate.  The press is overwhelming

13   in this case.  But none of this is to say he will not make

14   himself available for questioning on investigated matters, and

15   indeed, as you know, he's already met with the Southern

16   District on one of those matters.

17           But it's also unfair and it's mere innuendo that

18   Mr. Cohen would not describe his own misconduct, as the

19   government says twice, "if any."  I know the Court is aware

20   that search warrants were executed in this case.  As a result,

21   all of his papers, computers, devices, phones, and recordings

22   were seized and dozens of agents, and at least four Assistant

23   U.S. Attorneys and supervisors, questioned dozens and dozens of

24   witnesses and reviewed the evidence.  They know what is there.

25   He pled to what he pled to, and the plea agreement immunized

ICCQCOHs

1    him for the conduct that the plea agreement immunized him for.

2    When the government repeats twice that Mr. Cohen declined to

3    disclose his prior bad acts "if any," they come forward with

4    nothing to suggest that they don't know everything already,

5    much less that there's anything there.

6           At the end of the day, it's not that important, your

7    Honor.  I just don't think it's fair.  I don't really

8    understand the strident tone of the memo, and trying to put it

9    into context, I'm looking at the beginning of the case.  First,

10   an unwillingness to delineate charges, a claim that I should

11   already know what they are.  A few days to respond once three

12   categories of alleged offenses were set forth.  And then after

13   the plea, a courthouse press conference on a plea of guilty.  I

14   submit, your Honor, that no other defendant would be treated in

15   this fashion on these offenses, but Mr. Cohen had the

16   misfortune to have been counsel to the President.

17          This rush to charge and media display suggest,

18   respectfully, that the Court should take with a healthy grain

19   of salt the contentions by the Southern District of New York

20   that Mr. Cohen left them at the altar of a Southern District

21   cooperation agreement.  Rather, he made a personal and rational

22   decision that he would respond truthfully to any investigative

23   topic, but that it was not in his or his family's interest to

24   remain in the constant glare and under the requirements of a

25   cooperation agreement which could go on for months and months

ICCQCOHs

 1   and years and years.  And he sat down with Southern, and they

 2   found him "forthright and credible."  Page 15.

 3         The rules of the Southern District of New York as to

 4   how every case of cooperation should proceed, of course, were

 5   given to us by the minor gods and woe unto those who fail to

 6   follow their scriptures, but they don't mean that they work in

 7   every situation, no matter the facts, no matter the

 8   circumstances.  They don't mean the prosecutor is always right

 9   about how the standard procedure will play out.

10         And, effectively, your Honor, the Southern District

11   would have this Court penalize Mr. Cohen because he did not

12   follow their standard form agreement and procedure even though

13   he cooperated with the Special Counsel, provided them with

14   forthright and credible information, and offered, and hereby

15   offers, to respond to any other questions, and they would do it

16   without putting forth anything to suggest that there's any

17   there there by way of prior bad acts.  This approach, your

18   Honor, is erroneous.  It's error to consider what they are

19   asking you to consider.  It's fundamentally unfair for a

20   prosecutor to ask a Court to sentence a defendant on

21   hypothetical facts and circumstances rather than based on the

22   facts and circumstances that the Court actually knows.  Those

23   facts and circumstances do not present a mystery of the kind

24   that the office's memorandum seeks to suggest.  I don't know

25   what's behind it, and it's peculiar in a context in which a

ICCQCOHs

1    sibling office of the DOJ agrees that Mr. Cohen cooperated as

2    set forth in the plea agreement and as reported to your Honor

3    in the Special Counsel's letter.

4            I'm not going to overly speculate about what's going

5    on here.  I think the Court has as much experience as I in

6    these matters, but I would suggest that power to the Southern

7    District if they want to make a bigger case than they've

8    already made, God bless them.  And maybe there's a little bit

9    of pride involved here in not being at the center of attention.

10   Who knows?  Maybe all those articles about a big financial

11   fraud case and a big taxi medallion case followed by these

12   pleas is somehow disappointing.  It's not for me to say.

13           We respectfully request, your Honor, a variance under

14   the guidelines and the exercise of leniency in the imposition

15   of sentence on Mr. Cohen, and we request that on behalf of our

16   client and his family.  He has done, Michael has, a good deal

17   to help, not only the Special Counsel but a lot of people.  He

18   is a very good man.

19           Thank you.

20           THE COURT:  Thank you, Mr. Petrillo.

21           Ms. Rhee, does the Special Counsel's Office wish to be

22   heard?

23           MS. RHEE:  Yes, your Honor.

24           Thank you, your Honor.  On behalf of the Special

25   Counsel's Office, our remarks will be brief.  We rely, and we

ICCQCOHs

speak primarily through our written submission which has

already been submitted to this Court.  In supplement to that,

we just have two discrete, important points that we want to

highlight for the Court's attention.

The first is that the offense that Mr. Cohen pled to

in 18 CR 850 was a serious criminal violation.  As Mr. Petrillo

alluded to, the subject at issue here that Mr. Cohen actively

misled Congress about was an issue of national importance and

interest, and Mr. Cohen intentionally repeated many of the

false statements to us at the Special Counsel's Office

initially when we met with him in July.  And those false

statements were intended to limit ongoing investigations into

Russian interference in a U.S. presidential election, and the

question of any links or coordination between a campaign and a

foreign government.  Our submission elucidates why those lies

were material, why those lies were consequential.

But what we really want to leave with the Court today

for the Court's consideration is Mr. Cohen's interactions with

the Special Counsel's Office since that initial voluntary

interview in July.  The government has agreed with Mr. Cohen to

bring his assistance to your attention for due consideration at

this sentencing, and what we want to say about that is that

Mr. Cohen has endeavored from his second session with us in

September of this year going forward to this day, he has

endeavored to account for his criminal misconduct in numerous

ICCQCOHs

1   ways.  He has fully accepted responsibility for the lies that

2   he told Congress.  He has provided our office with credible and

3   reliable information about core Russia-related issues under

4   investigation and within the purview of the Special Counsel's

5   Office.  There is only so much that we can say about the

6   particulars at this time given our ongoing investigation, but

7   we hope that we have sufficiently outlined for the Court that

8   they were ranging, and that they were helpful.

9            Finally, your Honor, what we want to highlight for

10  this Court is that one of the things that we and the Special

11  Counsel's Office have most appreciated about Mr. Cohen's

12  assistance is that he has provided valuable information,

13  investigative information, to us while taking care and being

14  careful to note what he knows and what he doesn't know.  Rather

15  than inflate the value of any information that he has brought

16  forward to us in what he had to provide, Mr. Cohen has sought

17  to tell us the truth, and that is of utmost value to us as we

18  seek in our office to determine what in fact occurred.

19            And so we want to highlight that for the Court and to

20  underscore what we set out in our submission about the value,

21  the nature, the reliability, and the credibility of Mr. Cohen's

22  assistance.

23            THE COURT:  Thank you, Ms. Rhee.

24            MS. RHEE:  Thank you, your Honor.

25            THE COURT:  Mr. Roos, does the United States

ICCQCOHs

1    Attorney's Office wish to be heard?

2              MR. ROOS:  Yes, your Honor.  Thank you.

3              Your Honor, I'd like to start where Mr. Petrillo

4    ended, which is to share a few words about the information that

5    Mr. Cohen provided to law enforcement and the credit that is

6    appropriate.

7              Now, we agree that Mr. Cohen's decision to provide

8    information to the Special Counsel's Office in matters of

9    national interest is deserving of credit, and we defer to SCO's

10   description of Mr. Cohen's assistance to them and in their

11   investigation.  We don't dispute any of that assessment or the

12   assessment, frankly, that defense counsel has made.

13             But for the reasons that we've detailed in our

14   sentencing memorandum, any downward variance that Mr. Cohen

15   receives should be modest.  Any successful assistance Mr. Cohen

16   provided was in the context of a case where the guidelines

17   range is zero to six months.  It's within the context of the

18   Special Counsel Office's case.

19             But here, he is facing three additional categories of

20   crimes, eight total charges, and didn't come anywhere close to

21   assisting this office in an investigation.  There is no mystery

22   about this.  No one is attempting to penalize Mr. Cohen for not

23   cooperating.  Quite the opposite, there is no obligation to

24   cooperate, but for all the hypothesizing that Mr. Petrillo has

25   done, Mr. Cohen can't have it both ways.  There is a standard

ICCQCOHs

way in which this office conducts cooperation.  Your Honor is

familiar with it.  There is no reason, no matter the

significance or the nature of the case, whether or not it

receives public attention, for us to depart from that practice.

We've treated Mr. Cohen just the way we treat every other

defendant that deals with the United States Attorney's Office.

Now, Mr. Cohen, he chose not to pursue the path of

full cooperation.  He didn't provide substantial assistance to

the government in this investigation, and he doesn't have a 5K

letter.  And for these reasons, our view is that a significant

variance, the variance urged by the defendant isn't warranted

here.  To do so would send the wrong message.  It would send

the message that a defendant who chooses a different path, a

selective cooperation on only particular subjects can receive

the credit that so many defendants seek when they expose

themselves completely to the government.

Now, I'd like to touch on two points, two of the

3553(a) factors that in the government's view are so important

here, and they really go to what Mr. Petrillo said about the

nature and the seriousness of these offenses.

So, first, the defendant pled guilty to four crimes

here, your Honor, and Mr. Petrillo, he identified areas in

which certain crimes in their view may not be as serious, but

he pled guilty to four different crimes, and your Honor is

sentencing Mr. Cohen not only on four different charges but

ICCQCOHs

1    four separate crimes.  Each of those charges is itself serious.

2    Each merits punishment in its own right.  Each cause a distinct

3    harm, and taken together there is a compounding effect.

4    Collectively, the charges portray a pattern of deception, of

5    brazenness, and of greed that manifested in multiple aspects of

6    Mr. Cohen's professional life.

7            In particular, Mr. Cohen's conduct related to the

8    election is serious because of the tremendous societal cost

9    associated with the campaign finance crimes and the lies to

10   Congress.  Mr. Cohen committed these deceptive acts to protect

11   the political campaign from allegations of impropriety, and, by

12   his own admission, he committed the campaign finance crimes for

13   the purpose of influencing the election.

14           He also, quite brazenly, stole millions of dollars in

15   income from the IRS.  And on this subject, defense counsel

16   describes the ways in which this is really nothing more than a

17   civil matter.  But that is not the case, your Honor.  These tax

18   crimes went on for at least five years.  They involve millions

19   of dollars of income that was deliberately not reported to the

20   IRS.  This is not a case of an assessed tax not being paid.

21   It's something quite different.  It was deliberate, it was

22   willful, and that's what the defendant's plea reflects.

23           Now, together these crimes implicate core defining

24   parts of our democracy:  Government funded by the people, free

25   and transparent elections.  And in committing these crimes,

ICCQCOHs

1   Mr. Cohen has eroded faith in the electoral process and

2   compromised the rule of law.  And so just as he asks for

3   leniency because of what he claims he's done for the republic,

4   the same can be true in the way in which he's undermined it.

5   All of these facts, your Honor, favor a substantial custodial

6   sentence.

7        But the second reason why a substantial custodial

8   sentence is warranted here is because of the need to promote

9   deterrence.  And when it comes to Mr. Cohen, his training and

10  experience as an attorney should have been a deterrent to his

11  own criminal conduct.  Instead, he used his legal license in

12  furtherance of his crimes, and that is a significant point that

13  should be taken into consideration in sentencing.  A

14  substantial sentence would serve as a deterrent to future

15  criminal conduct by this particular defendant.

16       But more importantly, your Honor, a substantial

17  sentence would also serve as a general deterrent to future

18  criminal conduct by individuals like Mr. Cohen.  This is

19  particularly important in the context of tax evasion and the

20  campaign's finance crimes, crimes that are difficult to detect,

21  that are so frequently orchestrated through private

22  transactions kept secret from the public.  The unfairness here

23  is not to Mr. Cohen.  It's to the public.  Particularly in

24  light of the public interest in this case, a meaningful

25  sentence of imprisonment, one that sends a message, an

ICCQCOHs

1    appropriate message about the seriousness of these crimes is

2    appropriate.  That sort of message must be sent in this case,

3    that even powerful and privileged individuals cannot violate

4    these laws with impunity.

5            Unless the Court has any questions for the government,

6    we otherwise rest on our submission

7            THE COURT:  Thank you, Mr. Roos.

8            MR. PETRILLO:  Just a point of clarification, your

9    Honor, if I may.

10           THE COURT:  Yes.  Go ahead, Mr. Petrillo.

11           MR. PETRILLO:  I just want to be clear because I

12   wasn't sure whether Mr. Roos affirmed or failed to affirm that

13   the government; that is, the Southern District, by a letter

14   dated November 29 in this case captioned with this case number

15   that is the first plea before your Honor, agreed that the

16   defendant's provision of information to the Special Counsel is

17   a factor to be considered by the Court under Title 18

18   U.S. Code, Section 3553(a) in the first case, not just the

19   second case.  And I wasn't sure whether I heard properly that

20   Mr. Roos was delineating between the two cases.  I may just

21   have misheard, but I want to make sure it's clear.

22           MR. ROOS:  Your Honor, if I may?

23           THE COURT:  You may.

24           MR. ROOS:  I believe this was the first point I

25   addressed, but to clarify any confusion, the government's view

ICCQCOHs

1   is that the defendant provided information that was valuable to

2   the Special Counsel's Office.  We don't dispute that.  And

3   that's the reason why the government is seeking or recommends a

4   modest variance in this case as opposed to seeking a guideline

5   sentence.  So I guess the answer to Mr. Petrillo's question is

6   yes.

7              THE COURT:  All right.  Thank you.

8              Mr. Petrillo, does your client wish to address the

9   Court before sentence is imposed?

10             MR. PETRILLO:  He does, your Honor, and he's asked me

11  just to clarify because he heard -- and, again, I may have

12  heard it incorrectly, that -- the amount of restitution in this

13  case; that is, the amount due and owing to the IRS is

14  approximately $1.393 million, and he's under the impression the

15  Court may have said that the guidelines range started where it

16  did because the loss amount was one and a half million.  And he

17  just wanted to make sure that that point was entered into the

18  record.  It doesn't change our position on the guidelines

19  though, and I am only noting it for the record.

20             And Mr. Cohen would like to be heard, your Honor.

21             THE COURT:  Fine.  I'll hear from Mr. Cohen now.

22             THE DEFENDANT:  Your Honor, stand here or to the

23  podium?

24             THE COURT:  I think it would be best to take the

25  podium.

ICCQCOHs

1          THE DEFENDANT:  Thank you, your Honor.

2          I stand before your Honor humbly and painfully aware

3    that we are here today for one reason:  Because of my actions

4    that I pled guilty to on August 21, and as well on November 29.

5          I take full responsibility for each act that I pled

6    guilty to, the personal ones to me and those involving the

7    President of the United States of America.  Viktor Frankl in

8    his book, "Man's Search for Meaning," he wrote, "There are

9    forces beyond your control that can take away everything you

10   possess except one thing, your freedom to choose how you will

11   respond to the situation."

12         Your Honor, this may seem hard to believe, but today

13   is one of the most meaningful days of my life.  The irony is

14   today is the day I am getting my freedom back as you sit at the

15   bench and you contemplate my fate.

16         I have been living in a personal and mental

17   incarceration ever since the fateful day that I accepted the

18   offer to work for a famous real estate mogul whose business

19   acumen I truly admired.  In fact, I now know that there is

20   little to be admired.  I want to be clear.  I blame myself for

21   the conduct which has brought me here today, and it was my own

22   weakness, and a blind loyalty to this man that led me to choose

23   a path of darkness over light.  It is for these reasons I chose

24   to participate in the elicit act of the President rather than

25   to listen to my own inner voice which should have warned me

ICCQCOHs

1    that the campaign finance violations that I later pled guilty

2    to were insidious.

3            Recently, the President Tweeted a statement calling me

4    weak, and he was correct, but for a much different reason than

5    he was implying.  It was because time and time again I felt it

6    was my duty to cover up his dirty deeds rather than to listen

7    to my own inner voice and my moral compass.  My weakness can be

8    characterized as a blind loyalty to Donald Trump, and I was

9    weak for not having the strength to question and to refuse his

10   demands.  I have already spent years living a personal and

11   mental incarceration, which no matter what is decided today,

12   owning this mistake will free me to be once more the person I

13   really am.

14           Your Honor, I love my family more than anything in the

15   world:  My dad who is here today, my mom, my in-laws, siblings,

16   love of my life, my wife Laura, my pride and joy, my daughter

17   Samantha, my son, Jake.  There is no sentence that could

18   supersede the suffering that I live with on a daily basis,

19   knowing that my actions have brought undeserved pain and shame

20   upon my family.  I deserve that pain.  They do not.

21           I also stand before my children, for them to see their

22   father taking responsibility for his mistakes, mistakes that

23   have forced them to bear a shameful spotlight which they have

24   done nothing to deserve, and this breaks my heart.  For me, the

25   greatest punishment has been seeing the unbearable pain that my

ICCQCOHs

1    actions and my associations have brought to my entire family.

2    My mom, my dad, this isn't what they deserve to see in their

3    older age, especially when as a child they emphasized to all of

4    us the difference between right and wrong.  And I'm sorry.

5            I believed during this process that there were only

6    two things I could do to minimize the pain to my family:  Admit

7    my guilt and move these proceedings along.  This is why I did

8    not enter into a cooperation agreement.  I have elected to be

9    sentenced without asking for adjournment.  I have given

10   information during countless hours of meetings with prosecutors

11   that have been cited as substantial, meaningful and credible.

12   I have chosen this unorthodox path because the faster I am

13   sentenced, the sooner I can return to my family, be the father

14   I want to be, the husband I want to be, and a productive member

15   of society again.  I do not need a cooperation agreement to be

16   in place to do the right thing.  And I will continue to

17   cooperate with government, offering as much information as I

18   truthfully possess.

19           I stand behind my statement that I made to George

20   Stephanopoulos, that my wife, my daughter, my son have my first

21   loyalty and always will.  I put family and country first.  My

22   departure as a loyal soldier to the President bears a very

23   hefty price.

24           For months now the President of the United States, one

25   of the most powerful men in the world, publicly mocks me,

1    calling me a rat and a liar, and insists that the Court

2    sentence me to the absolute maximum time in prison.  Not only

3    is this improper; it creates a false sense that the President

4    can weigh in on the outcome of judicial proceedings that

5    implicate him.  Despite being vilified by the press and

6    inundated with character assassinations over the past almost

7    two years, I still stand today, and I am committed to proving

8    my integrity and ensuring that history will not remember me as

9    the villain of his story.  I now know that every action I take

10   in the future has to be well thought out and with honorable

11   intention because I wish to leave no room for future mistakes

12   in my life.

13          And so I beseech your Honor to consider this path that

14   I am currently taking when sentencing me today.  And I want to

15   apologize to my entire family for what my actions have put them

16   through.  My family has suffered immeasurably in the home and

17   the world outside.  I know I have let them all down, and it

18   will be my life's work to make it right, and to become the best

19   version of myself.

20          Most all, I want to apologize to the people of the

21   United States.  You deserve to know the truth and lying to you

22   was unjust.  I want to thank you, your Honor, for all the time

23   I'm sure you've committed to this matter and the consideration

24   that you have given to my future.

25          Again, I want to thank my family, my friends, many who

ICCQCOHs

1    are here today, who are with me, especially all the people who

2    wrote letters on my behalf.  In addition, I would like to thank

3    the tens of thousands of strangers who despite not knowing me

4    at all, not knowing me personally have shown kindness and

5    empathy in writing letters to me and offering support and

6    prayer.  And I thank you, your Honor, I am truly sorry, and I

7    promise I will be better.

8              THE COURT:  You may be seated, Mr. Cohen.

9              THE DEFENDANT:  Thank you.

10             THE COURT:  The defendant, Michael Cohen, comes before

11   this Court, having pled guilty to five counts of income tax

12   evasion, one count of making false statements to a banking

13   institution, one count of causing an unlawful corporate

14   contribution, and one count of an excessive campaign

15   contribution in the 18 CR 602 criminal case, and one count of

16   making false statements to the U.S. Congress in 18 CR 850.

17   Each of these crimes is a serious offense against the United

18   States.

19             Now, I've reviewed the revised presentence

20   investigation report, and I adopt the findings of fact in that

21   report as my own.  I will cause the report to be docketed and

22   filed under seal as part of the record in each of these cases.

23   I have also reviewed all of the memoranda submitted by counsel

24   for the parties and the letters submitted on Mr. Cohen's

25   behalf.

1            I previously reviewed the guidelines with all of you.

2    Suffice it to say at this juncture that with respect to the

3    first case, the guidelines range is 51 to 63 months of

4    imprisonment, and the guideline range on the second case is

5    zero to six months of imprisonment.  Of course, the Sentencing

6    Guidelines should be the starting point and the initial

7    benchmark.

8            Turning to the 3553(a) factors, the question for this

9    Court is what is the appropriate and just sentence for these

10   crimes and this defendant.  Mr. Cohen pled guilty to a

11   veritable smorgasbord of fraudulent conduct:  Willful tax

12   evasion, making false statements to a financial institution,

13   illegal campaign contributions, and making false statements to

14   Congress.  Each of the crimes involved deception and each

15   appears to have been motivated by personal greed and ambition.

16           His extensive criminal conduct also has broader public

17   consequences.  Mr. Cohen evaded more than $1.3 million in

18   personal income taxes for the tax years 2012 through 2016.  He

19   willfully failed to report $4 million earned through various

20   streams of income from leasing taxi medallions to consulting

21   fees and brokerage commissions.  As Justice Oliver Wendell

22   Holmes famously said, "Taxes are the price we pay for a

23   civilized society."

24           Now, Mr. Cohen also made a series of false statements

25   to financial institutions regarding his liabilities and monthly

expenses so that he would be approved for a $500,000 home

equity line of credit.

          Further, Mr. Cohen committed two campaign finance

crimes on the eve of the 2016 presidential election with the

intent to influence the outcome of that election.  He made or

facilitated payments to silence two women who threatened to go

public with details of purported extramarital affairs, and

Mr. Cohen admitted that he did so in coordination with and at

the direction of Individual One.

          Finally, in a separate criminal proceeding filed by

the Special Counsel's Office, Mr. Cohen admitted that he made

false statements about a proposed business project in Moscow to

congressional committees investigating possible interference by

the Russian government with the 2016 presidential election.

Each of these crimes standing alone warrant serious punishment.

          The financial harms are readily ascertainable.

Mr. Cohen's tax evasion offenses cheated the federal government

out of $1,393,858.  His deception caused a bank to approve a

$500,000 line of credit he did not deserve.  And even his

campaign finance crimes may be measured by the amount of

unlawful contributions:  The $150,000 hush money payment that

he coordinated, and the $130,000 hush money payment that he

funneled from his home equity loan through a shell corporation.

          While this is his first conviction, the magnitude,

breadth, and duration of his criminal conduct requires specific

ICCQCOHs

deterrence.  Tax and campaign finance prosecutions are rare,
but unlike the mine-run tax evasion or campaign finance
violation, Mr. Cohen's crimes implicate a far more insidious
harm to our democratic institutions, especially in view of his
subsequent plea to making false statements to Congress.  Thus,
the need for general deterrence is amplified in this case.

        Now, Mr. Cohen had a comfortable childhood and enjoyed
all the privileges of growing up in a close-knit, upper class
suburb on Long Island.  He and his siblings had loving parents
who worked hard to provide everything for their children.  He
graduated from law school and practiced law in various law
firms until the Trump organization hired him as an attorney in
2007.  Thereafter, his entire professional life apparently
revolved around the Trump organization.  He thrived on his
access to wealthy and powerful people, and he became one
himself.

        The letters submitted on his behalf reveal a man
dedicated to his family and generous with his time and money to
help people in his own orbit.  A number of individuals have
written to me describing how Mr. Cohen came to their aid
without seeking anything in return.  Of course, that kind of
generosity is laudable.  But somewhere along the way Mr. Cohen
appears to have lost his moral compass and sought instead to
monetize his new-found influence.  That trajectory,
unfortunately, has led him to this courtroom today.

ICCQCOHs

1          While Mr. Cohen does not have a formal cooperation

2     agreement with the United States Attorney's Office, he has

3     nevertheless met with prosecutors on a number of occasions.

4     The Special Counsel's Office notes that he has voluntarily

5     provided information "about his own conduct and that of others

6     on core topics under investigation" by the Special Counsel and

7     that the information he has provided has been "relevant and

8     useful."Further, the Special Counsel urges that any sentence

9     imposed in connection with 18 CR 850 should be concurrent to

10    any sentence imposed in the earlier case.

11         While the United States Attorney's Office acknowledges

12    that Mr. Cohen's assistance to the Special Counsel's Office was

13    "significant" and warrants a modest variance from the

14    guidelines range, they contend that it should not approach the

15    type of credit typically given to cooperating witnesses in this

16    district.

17         However, cooperation, even when it is not the product

18    of a formal agreement, should be encouraged where information

19    is provided that advances criminal investigations.  Our system

20    of justice would be less robust without the use of cooperating

21    witnesses to assist law enforcement.

22         Based on the submissions of the parties, this Court

23    agrees that Mr. Cohen should receive some credit for providing

24    assistance to the Special Counsel's Office.  While Mr. Cohen

25    pledges to assist the Special Counsel's Office in further

ICCQCOHs

1    investigations, that is not a matter that this Court can

2    consider now.

3          There is an acute need for the sentence here to

4    reflect the seriousness of the offenses and to promote respect

5    for the law.  As a lawyer, Mr. Cohen should have known better.

6    Tax evasion undercuts the government's ability to provide

7    essential services on which we all depend.  False statements to

8    banking institutions undermine the integrity of our financial

9    system.  Campaign finance violations threaten the fairness of

10   elections, and false statements to Congress interfere with the

11   fact-finding process in matters of national importance.

12         While Mr. Cohen has taken steps to mitigate his

13   criminal conduct by pleading guilty and volunteering useful

14   information to prosecutors, that does not wipe the slate clean.

15   Mr. Cohen selected the information he disclosed to the

16   government.  This Court cannot agree with the defendant's

17   assertion that no jail time is warranted.  In fact, this Court

18   firmly believes that a significant term of imprisonment is

19   fully justified in this highly publicized case to send a

20   message to those who contemplate avoiding their taxes, evading

21   campaign finance laws or lying to financial institutions or

22   Congress.  Our democratic institutions depend on the honesty of

23   our citizenry in dealing with the government.  And so it is

24   against that backdrop that I am prepared to sentence the

25   defendant.

ICCQCOHs

1          Mr. Cohen I'd ask, sir, that you stand at this time.

2          Mr. Cohen, it's my judgment, sir, that on 18 CR 602

3     that you be sentenced to a term of 36 months of imprisonment to

4     be followed by three years of supervised release on each count

5     to be served concurrently with the sentence that I will impose

6     in a moment on 18 CR 850.  I'm imposing all of the standard

7     conditions of supervised release and the following special

8     condition:  That you provide the probation department with

9     access to any requested financial information.

10          Further, I'm going to enter an order of forfeiture in

11     this case in the amount of $500,000, and I'm going to enter an

12     order for restitution in the amount of $1,393,858.  I am also

13     going to impose a fine of $50,000, and the mandatory special

14     assessment of $800.

15          Now, with respect to 18 CR 850, I sentence you to two

16     months of imprisonment to be served concurrently with the term

17     imposed in 18 CR 602 to be followed by three years of

18     supervised release, also to be served concurrently with the

19     term imposed in 18 CR 602, and with all of the standard

20     conditions of supervised release.

21          In this case with respect to 18 CR 850, I am also

22     going to impose a $50,000 fine in that case to recognize the

23     gravity of the harm of lying to Congress in matters of national

24     importance.  And, once again, I will impose the mandatory

25     special assessment in that case of $100.

ICCQCOHs

1           Just to be clear, the sentence in the earlier case is

2     concurrent on all counts in that information.

3           And so, Mr. Cohen, this constitutes the sentence of

4     this Court.  I advise you that to the extent you have not

5     previously waived your right to appeal, you have the right to

6     appeal.  I advise you further that if you cannot afford

7     counsel, counsel will be provided to you free of cost.

8     Mr. Petrillo has done a superb job in navigating you through

9     this matter and bringing the sentencing submissions before the

10    Court.  I'm confident that he and Ms. Lester will advise you

11    further with respect to your appellate rights.  You may be

12    seated, sir.

13           Are there any further applications at this time?

14           MR. ROOS:  Not from the government, your Honor.

15           THE COURT:  Ms. Rhee.

16           MS. RHEE:  Your Honor, the Special Counsel's Office

17    would just like to confirm that there will be a separate

18    $50,000 fine.

19           THE COURT:  Yes.

20           MS. RHEE:  Not to run concurrently.

21           THE COURT:  No, it's a separate fine.  It's a separate

22    harm, and the guidelines in my view do not recognize the

23    gravity of the offense of making false statements to Congress.

24           MS. RHEE:  Thank you for the clarification.

25           THE COURT:  Mr. Petrillo.

ICCQCOHs

1          MR. PETRILLO:  Your Honor, if you would, would the

2     Court give consideration to voluntary surrender by the

3     defendant and consider recommending the designation of

4     Otisville as the place of imprisonment?

5          THE COURT:  I will make that recommendation, and I

6     will allow for a voluntary surrender in this case.  What

7     surrender date are you seeking?

8          MR. PETRILLO:  I don't have one particularly in mind,

9     but from past experience it seems to take about 10 or 12 weeks

10    for the BOP to --

11         THE COURT:  Right.  Is March 6 all right?  And if for

12    some reason you've not been notified of a designated

13    institution, just write a short note to me, and I will put the

14    surrender date over.

15         MR. PETRILLO:  Very well.

16         THE COURT:  Go ahead.

17         MR. PETRILLO:  I have one other thing for the record

18    that doesn't require a ruling, but as you know, under *United*

19    *States v. Ganais* in the Second Circuit, it's incumbent upon the

20    defendant to demand his property back post a search procedure

21    as part of protecting his rights under the Fourth Amendment.

22    And so for the record, I'd like to make that demand and thus

23    have no confusion as to where that stands.

24         THE COURT:  All right.  I'm confident there will be

25    further briefing with respect to that matter after this

ICCQCOHs

1    proceeding is concluded, and I will await receipt of some

2    submission.

3              This matter is concluded.  Have a good afternoon

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25